### UNITED STATES v. MOORE.

(District Court, D. Kentucky.   October 3, 1900.)

POSTAL LAWS—CONSTRUCTION—MAILING PROHIBITED BOOK OR PAPER.

Under the provision of Rev. St. § 3893, imposing a penalty for knowingly mailing any "obscene, lewd, or lascivious" book or paper, in which the word "or" has been construed by the supreme court to mean "and," it is not sufficient to bring a publication within the prohibition that it is obscene, but it must also be lewd and lascivious; nor is an article non-mailable because it offends the religious sentiments of a majority of the people by attacking the doctrine of the immaculate conception of Christ in coarse or even obscene language, where it has no tendency to induce sexual immorality; that being the class of publications against which it is the purpose of the statute to protect the public.

Prosecution for an Offense against the Postal Laws.   On demurrer to indictment.

R. D. Hill, Dist. Atty., for the United States.
John G. Simrall, for defendant.

EVANS, District Judge.   The demurrer to the indictment in this case demands a construction of section 3893 of the Revised Statutes, which declares to be unmailable, and which imposes a penalty for knowingly mailing, "every obscene, lewd, or lascivious book or paper."   There might be some doubt as to the meaning and intent of congress in this legislation if the supreme court had not defined it in very clear, though possibly in very narrow, terms in the case of Swearingen v. U. S., 161 U. S. 448, 16 Sup. Ct. 562, 40 L. Ed. 765. After holding that the word "or," first occurring in the sentence above quoted, should be construed to mean "and," the court, at page 450, 161 U. S., page 563, 16 Sup. Ct., and page 766, 40 L. Ed., said:

"The offense aimed at in that portion of the statute we are now considering was the use of the mails to circulate or deliver matter to corrupt the morals of the people.   The words 'obscene,' 'lewd,' and 'lascivious,' as used in the statute, signify that form of immorality which has relation to sexual impurity, and have the same meaning as is given them at common law in prosecutions for obscene libel.   As the statute is highly penal, it should not be held to embrace language unless it is fairly within its letter and spirit."

It may be that this is a most strict construction of the language of the statute.   Still it is certainly binding upon this court, although four judges appear to have dissented from it.   But for this construction, I would not have found it difficult, and, indeed, it might have been pleasant, to hold that the paper mailed in this case was, at least, "obscene."   According to that decision, however, mere obscenity in a publication is not sufficient to make the mailing of it an offense.   Under that ruling, in addition to being obscene, the paper mailed must also be both lewd and lascivious; the court holding that all these words were used in the statute to describe one and the same offense.   An article entitled "The Virgin Mary," published by the accused in his paper, and knowingly mailed by him, is the basis of this indictment.   Those parts of the article most relied upon to sustain the charge, though ostensibly a discussion of a religious subject, are couched in language not quite suitable for inser-

tion in a judicial opinion, however well adjusted to such applause as might be expected from taste of a certain degree of degradation. It is, indeed, extremely difficult to perceive any sensible, useful, or creditable object which the writer, publisher, or circulator of it could have had in view, at least in the manner of treating the subject, though not to gauge the type of mind and taste which might be supposed to enjoy or indorse it; but, notwithstanding few people would either agree with its sentiments, or approve the coarse indecency of its language and thought, even if they did, it will be equally difficult to find support for a judicial determination that, if a writer believed the leading proposition supposed to be advanced, he might not have the right to say so, and to give his reasons for it, even if his manner of doing so is brutal in the estimation of others. The published article claims to treat a religious question, and it is insisted that the right to do this freely exists under the law, that such right is without limitations, and that the mails are open to such papers and discussions unless the matter published is "obscene, lewd, and lascivious," as defined by the supreme court. It is, indeed, quite true that the mails of the United States are intended to be very wide open for the reception and transmission of matter desired to be sent through them by the public, but there are still certain restrictions imposed by law, and among them is the exclusion of such books, papers, etc., as are described in section 3893, and the only inquiry in this case is, does the article referred to come within that description? In matters of religion or religious teaching or discussion it is well-nigh impossible (and, indeed, in this country it should be so) for any one to fix the limit or to draw the line where religious notions and the right to advocate them ends. There must be the widest latitude and freedom upon these subjects, and one man's right to express his views must not be higher nor better than that of another. It does not make a notion upon a religious subject obscene, or lewd, or lascivious because it may be most radically different from those of the majority. The matter mailed in this case questions the chastity of Mary, the wife of Joseph, and the mother of Jesus, and ridicules in coarse fashion the idea of the supernatural origin of the Son. This, indeed, is the chief idea of the article, but, unless infidelity and atheism are to be proscribed as beyond the bounds of the rule of the freedom of religious thought and speech which prevails under constitutional protection in this country, it cannot be justly said that the man who believes that the child Jesus came in the ordinary way of humanity may not advocate that belief, and thus attempt to establish his contention that the Christian religion is not the true one, or, indeed, that there is no true religion at all. The manner of the advocacy of such views will doubtless depend upon the vulgar coarseness upon the one hand or upon the refinement upon the other of the mind and taste of the person advocating the doctrine; but the right to advocate it cannot be made to depend upon such a test. Nor can the right to advocate such views depend upon their unpopularity. The language of this publication respecting God, in which the writer insists that Mary was unchaste, or else that Jesus was the son of Joseph, may be blasphe-

mous; but the statute does not forbid the mailing of merely blasphemous writings. What was mailed in this instance might be libelous of Mary if she were now living; but libels, even as disgusting to every refined, even if unbelieving, person, as this must be, are not unmailable under the statute. The coarse accusation against Mary, while possibly obscene, is in no sense lewd or lascivious within the meaning of the statute as construed by the supreme court, as it would in no way allure or invite, and evidently was not intended to allure or invite, any person to sexual impurity, or to immoral conduct, as distinguished from religious or irreligious beliefs.

The case of Dunlop v. U. S., 165 U. S. 497, 17 Sup. Ct. 375, 41 L. Ed. 799, is one which appears to well illustrate the purpose of the statute. The paper there mailed contained an advertisement of an obscene, lewd, and lascivious occupation called "massage," which was but a respectable name for a licentious pursuit, and the persons mailing the paper well knowing these facts, and the immoral purpose of the advertiser, were held punishable under the statute for knowingly mailing such a publication. But to mail a paper which merely states or contends that even such a woman as Mary had actually been unchaste in the remote past is not, and cannot be, an offense under the statute, unless such statement is not only obscene, but one which, fairly construed, has a tendency to lead to lewdness and lasciviousness, within the meaning of those words as construed by the supreme court. To state such a proposition is to show that it cannot be maintained. To allege or contend, however falsely, that a woman, the most honored among men, was in fact unchaste thousands of years ago, cannot naturally or justly be said to have a tendency to allure men now to such immorality as relates to sexual impurity. A publication of the sort would rather arouse disgust. Without intending to compare the women, it may illustrate our meaning to say that Plutarch asserts that both Aspasia and Cleopatra, two of the most celebrated women of ancient times, had been unchaste. This assertion is made in language of characteristic refinement and taste, though none the less clearly on that account. Whether the assertion is true or false, the Lives is not unmailable under the statute, because he states these things to be the facts of past history. The reason is, under the decision of the supreme court, that the mere assertion in a book or paper that a woman has been unchaste, and has given birth to a bastard, even if the language used to do so is vulgar and unrefined, does not make that publication, even though obscene, also lewd and lascivious, within the intent of the statute, however gross and inexcusable the libel upon the person may be. So every day the newspapers make substantially similar statements about women, and sometimes in language quite unacceptable, but congress has passed no law to exclude them from the mails on that account. It seems to the court, therefore, under the stress of the decision of the supreme court referred to, that, in order to bring a book or paper within the meaning of the statute, the object and purpose of it, or of mailing it, must be, not to convert others to what may be absurd views of religion, or to ridiculous notions upon religion or upon the Bible, but

to corrupt the morals—that is to say, the manners and habits—of the people with respect to sexual indulgencies, or to invite them to lewd, obscene, and lascivious places, or to conduct properly described by those adjectives. To send through the mails papers advocating notions upon the Christian religion or its foundation which are different from those almost universally held in this country, or which may be abhorrent to those who oppose them, is not a violation of the statute referred to. Such publication may be offensive to the majority, but that furnishes no reason for holding that the individual violates any law of the United States in mailing it. The statute was not passed in any sense to protect or obstruct any form of religion, or of religious thought, as such, but its object is to prevent the use of the mails of the United States for the purpose of promoting such immoral tendencies as come within its provisions. We must look alone to the language of the statute, as properly construed, to ascertain whether the acts charged in an indictment violate the laws of the United States, for no act is punishable by the courts of the United States unless some express statute authorizes it.

In this case it seems to the court that the paper complained of was not obscene, lewd, and lascivious in the sense of the statute as construed by the supreme court, because, while it may tend to change, corrupt, or destroy the religious views of those who read it, it does not invite to any obscene, lewd, or lascivious conduct upon their part. And this seems to suggest the test by which the matter is to be determined, for otherwise the process of the court might be perverted into protecting the advocacy of one set of religious notions as against another. The statute, as already indicated, was not meant to protect religious views, or religion itself, in any general or special sense, but was intended to prevent the mailing of publications which are calculated to corrupt or debauch, with relation to sexual impurities, the morals—that is to say, the manners and conduct—of those into whose hands the papers might fall, by lewd, obscene, and lascivious suggestions, invitations, or tendencies. In the opinion of the court, whatever else may be said of the publication in this case, these elements are wanting. And not only has every man the right to advocate such religious or irreligious views as please him, but, subject, of course, to responsibility for their abuse, there must be for all freedom of speech and freedom of the press. The first article of amendments to the constitution of the United States is very clear and explicit. It is short enough, and certainly it is important enough, to be copied in full. It reads as follows:

"Article 1. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Many publications which might shock the average taste and the average notion of religion would still be entirely permissible under the guaranties of that amendment. Of course, congress could not constitutionally pass any law prohibiting the free exercise of religion, nor one which would restrict the free discussion, from every

104 F.—6

point of view, of all religious topics, by speech and in the press; but it has supreme control and power over the mails of the United States, and, in its discretion, may limit and restrict the uses thereof as it pleases, even to the exclusion of any form of publication whatever. However, it has in fact gone no further in this direction than provided in the statute cited, and that is as far as the courts can go. In the light of the decision in the Swearingen Case, the court is of opinion that congress has not, by any legislation, forbidden the circulation through the mails of even such a coarse and vulgar treatment of a subject as is found in the article referred to. To say that an individual may not attack or ridicule the Christian religion, or the contents and statements of the book and events upon which it is founded, and mail such an attack when published, without being guilty, in the latter act, of violating the statute quoted, might be agreeable to all true believers who were more inflamed by indignation than awake to the guaranties of the constitution; but such a construction would equally bar the right of the Christian by the distribution of his publications through the mails to question the contention of those who uphold and advocate other systems of religion. Certainly the court, in the discharge of its duties, must recognize the rights of all as being equal, and cannot hold that a paper written in advocacy of unusual opinions, even in a disgusting way, is obscene, lewd, and lascivious, and as tending to corrupt the morals of the people in relation to sexual impurities, because it antagonizes the Christian's view of the divine origin of the Christ. If the Christian religion is divine, it can withstand all attacks; but, whether divine or not, the constitution of the United States gives to all the right to discuss it from whatever standpoint they please, and, unless obscene, lewd, and lascivious, these discussions are not under the statute excluded from the mails. The demurrer to the indictment must, therefore, be sustained.