# UNITED STATES

*v.*

# PADRE VEGA, PADRE JANICES, AND MIGUEL POU.

San Juan, No. 410.   Indictment for mailing nonmailable matter.

1. Section 3893, U. S. Rev. Stat. (U. S. Comp. Stat. 1901, p. 2658), construed.
2. No language, however coarse or vulgar, is within the provisions of the section forbidding the use of the mails, unless it is also obscene, lewd, and lascivious, and tends to impurity in a sexual sense.
3. The section is directed at the effect of the language employed.

Opinion filed March 27, 1908.

*Mr. J. R. F. Savage,* United States Attorney, for the United States.

Note.—*Mail.*—As to obscene literature in mails, see note to Re Worthington Co. 24 L.R.A. 110. As to when one who does not personally mail nonmailable matter may be regarded as causing it to be deposited in the mails, see note to Demolli v. United States, 6 L.R.A. (N.S.) 424.

*Mr. Henry F. Hord,* for the defendants.

RODEY, Judge, delivered the following opinion:

On March 18th, the grand jury of this district returned an indictment against the defendants, for unlawfully and knowingly depositing in a postoffice of the United States at Ponce, Porto Rico, for mailing and delivery, contrary to the provisions of § 3893 of the Revised Statutes of the United States (U. S. Comp. Stat. 1901, p. 2658), certain alleged obscene, lewd, and lascivious nonmailable matter, which consisted of copies of a newspaper called "El Ideal Católico," dated February 8, 1908, containing an article entitled: "Concubinato Civil," which is the particular matter complained of. The newspaper in question is a Catholic organ, published in Spanish by the defendants, at said Ponce. The first two named defendants are priests of the Catholic church at that place, and the defendant Pou is said to be connected with the publishing of the paper. It was understood, at least for the purpose of the argument on the motion to quash, that all the defendants in some manner had to do with at least the mailing of the article in question.

The section of United States law which it is claimed was violated by the mailing of the article in question was first passed on June 8, 1872 (17 Stat. at L. 302, chap. 335), and was amended from time to time up to 1888, until it has been held that it is now broad enough to exclude from the mails every book, pamphlet, picture, paper, letter (whether private and sealed or otherwise), writing, print, or other publication of an indecent character, that is obscene, lewd, or lascivious.

The defendants, by their counsel, demurred to the indictment, and moved to quash the same; first, because it does not

III. PORTO RICO—31.

state or charge any offense against any law of the United States; and second, because it attempts to charge two distinct offenses. The latter ground was abandoned at the hearing, and the first alone relied on. We sustained the motion to quash the indictment, and ordered the discharge of the defendants, and the release of their bond. As the matter is of considerable importance, we have concluded to set forth the reasons that impelled us to hold that no offense was committed against the section of the law in question. A copy of the statute and a translation of the article complained of will be found at the end of this opinion, and it will, we think, be seen that the article is one intended only to discourage civil marriages on the part of adherents of the Catholic church. Its purpose from the writer's point of view is certainly not obscene, lewd, or lascivious, but quite the contrary. It is no part of our province to comment on the quality of the language used by the writer, or on the expediency or propriety of his act in publishing the same. We have to deal only with the question whether or not a crime under a law of the United States was committed. Neither are we called upon to express any opinion as to whether a libel has been committed against any of the persons referred to by the article, because that is not now before us, and will only arise to be passed upon by a court in case anyone can identify himself as being among the persons referred to, and shall bring a suit in a proper tribunal for the recovery of damages therefor.

In vol. 5 of Federal Statutes Annotated, beginning at page 840 and ending at page 846, will be found references to many cases adjudicated in the Federal courts generally, and in the Supreme Court of the United States, which undoubtedly settle it as the law, under the section here claimed to be violated, that no language, however coarse and even vulgar, and no matter

with what bad taste it may be used, is within the provisions of the statute in question unless it is also obscene, lewd, and lascivious, or tends in that direction; and these words are held to signify that form of immorality which has relation to sexual impurity; and in the act in question they have the same meaning as is given them at common law in prosecutions for obscene libel.

The leading and binding case on the subject is that of Swearingen v. United States, 161 U. S. 446, 40 L. ed. 765, 16 Sup. Ct. Rep. 562. In that case an editor of Burlington, Kansas, was indicted for sending copies of his paper through the mails, which referred, in a long article, to another editor of that town, in what is, to say the least, the coarest and about as vulgar language as it has ever been our lot to see in print. Yet the Supreme Court of the United States, although by a divided court, held that article not to be contrary to the law in question, and reversed the lower court that had held the editor guilty. It is set out in the syllabus of that case that the newspaper article, while its language was coarse, vulgar, and, as applied to an individual, libelous, was not of such a lewd, lascivious, and obscene tendency, calculated to corrupt and debauch the minds of those into whose hands it might fall, as to make it an offense to deposit it in the postoffice of the United States, to be conveyed by mail and delivered to the person to whom it was addressed. "It is the effect of the language employed, having obscene, lewd, or lascivious suggestions, tainted with immorality and impurity, which is struck at by the statute." United States v. Moore, 129 Fed. 159.

It was held in the case of United States v. Moore, 104 Fed. 78, which was a prosecution against the defendant for mailing pamphlets denying the immaculate conception of the Savior in rather coarse language, that papers advocating notions upon the

United States v. Vega.

Christian religion or its foundation, which are different from those almost universally held in this country, or which may be abhorrent to those who oppose them, is not a violation of the statute referred to. Such publication may be offensive to the majority, but that furnishes no reason for holding that the individual violates any law of the United States in mailing it. The statute was not passed in any sense to protect or obstruct any form of religion, or of religious thought, as such, but its object is to prevent the use of the mails of the United States for the purpose of promoting such immoral tendencies as come within its provisions.

We are aware, of course, that it was held in the case of United States v. Males, 51 Fed. 41, that the writing need not use words which, in themselves, are obscene, in order to be obscene, and that courts have regard to the idea conveyed by the words used in the writing, and not simply to the words themselves; but we think that view of the law rather sustains the contention of defendants here.

It cannot be questioned, from the tenor of the article complained of, that it was, from his point of view, the intention of the writer to improve the morals of others than the persons referred to, and to prevent the recurrence of what he considered to be wrong; but, as stated, however we may disagree with the propriety, good taste, or even legality of his remarks in that regard, we cannot see that he has violated the act in question, even though it shall turn out that he has, in fact, libeled the persons referred to. They, if libeled, have their remedy by a proper action.

Under our form of government, church and state must forever remain separate; and if they perchance collide, which we do not think is at all necessary, the church must get out of the

way. Our government never interferes in religious matters save when any sect or denomination under the protection of our liberal policy as to religion attempts to indulge in practices contrary to good morals and decency, as in the case of polygamists and others.

Universally in this country marriage is considered by the law of the land as a civil contract, and all men and women competent to enter into that state civilly are entitled to do so without being libeled therefor by any person whatsoever. It is not intended by this remark to detract one jot from the right of any religious sect to preach to its adherents the desirability of entering matrimony under the law, through a cermony performed by one of its own clergymen, according to its own rites and customs.

Porto Rico, in 1902, adopted a modern American code, and, by § 129 thereof, recognizes marriage as a civil institution, originating in a civil contract, whereby the man and the woman mutually agree to become husband and wife, and to discharge towards each other the duties imposed by law. It can make no difference to the law whether the individuals concerned enter into this civil contract before a municipal judge or a clergyman of any denomination who may be authorized by law to perform the ceremony. The legal contract in each case is one and the same, and all persons have a right to be satisfied with that, and to dispense with a religious ceremony if they so desire.

Respect for the law of the land is expected from, and is to be commended in, all good citizens; and, in proper cases, it is enforced from all persons subject to the law, where it is not thus accorded.

Notwithstanding that treason against the United States consists only in overt acts of levying war against the country, or

in adhering to its enemies and giving them aid and comfort, still there are things that may be done by individuals, which, while they do not amount to treason, certainly approach the line of disrespect toward the law; but, as to those things, each individual is, of course, the judge of the propriety of his own conduct in so far as the law is concerned. While Congress can pass no law abridging the freedom of speech or of the press, or prohibiting the free exercise of, or respecting the establishment of, modes of religious worship, still, as between individuals, all persons are responsible for any abuse of these great privileges.

In furtherance of the national policy of keeping church and state apart, one of the very first things Congress did with reference to Porto Rico, on the establishment of civil government on the island, in the year 1900, was, by § 8 of the organic act (31 Stat. at L. 77, chap. 191), to annul a law that had come down from Spain, and had been inadvertently continued in force by the military commander when in charge of the island. It prohibited priests, ministers, or followers of any faith from marrying, just because they had taken vows not to. And another thing was the enactment of a law to make adultery of the husband equally a ground for divorce with that of the wife, which had not been the case under Spanish law; and this new law further provided that all persons lawfully married in. Porto Rico should have all the rights and remedies conferred by law upon any other person.

For the reasons stated, and because we do not think the article in question, whatever our opinion as to the propriety of publishing the same may be, comes within the terms of the section of the law referred to, we are constrained to sustain the motion to quash the indictment, and it is so ordered.

United States v. Vega.

Sec. 3893 (U. S. Comp. Stat. 1901, p. 2658). Every obscene, lewd, or lascivious book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character, and every article or thing designed or intended for the prevention of conception or procuring of abortion, and every article or thing intended or adapted for any indecent or immoral use, and every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind, giving information, directly or indirectly, where or how, or of whom, or by what means, any of the hereinbefore mentioned matters, articles, or things may be obtained or made, whether sealed as first-class matter or not, are hereby declared to be nonmailable matter, and shall not be conveyed in the mails nor delivered from any postoffice, nor by any letter carrier; and any person who shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be nonmailable matter, and any person who shall knowingly take the same, or cause the same to be taken, from the mails for the purpose of circulating or disposing of, or of aiding in the circulation or disposition of, the same, shall, for each and every offense, be fined, upon conviction thereof, not more than five thousand dollars, or imprisoned at hard labor not more than five years, or both, at the discretion of the court. And all offenses committed under the section of which this is amendatory, prior to the approval of this act, may be prosecuted and punished under the same, in the same manner, and with the same effect, as if this act had not been passed: Provided, That nothing in this act shall authorize any person to open any letter or sealed matter of the first class not addressed to himself.

---

CIVIL CONCUBINAGE.

I read with deep regret in the "Ideal Católico" of the 25th of January that a young lady of Ponce, who belonged to the Association of the Daughters of Mary, has had the impudence to contract civil marriage with a man who had been married by the church and divorced civilly from his legitimate wife.

In Cabo Rojo we witnessed, during this last month of January, the elopement of a girl who belonged to the Association of the Daughters of Mary, contracting civil matrimony with her bridegroom a few moments after having eluded the vigilance of her inconsolable and aggrieved parents. The Daughters of Mary of this town have stricken from their membership roll the name of the unfortunate girl, and protest with all energy against such indignant conduct by any person calling herself a Catholic.

The time has arrived when we should call things by their proper names.

## United States v. Vega.

Yes, Porto Rican Catholics, it is necessary to eliminate from our conversation and writings that fascinating word "civil matrimony." This mode of talking was invented by impious politicians to deceive the unsophisticated. To quote the famous Perujo, "Appendix lxxxi., in Supplem. Qu. xlv., rit. 1 and 5. The law of civil matrimony, says that theologian, should be entitled thus: "Law of Civil Concubinage;" or in these terms: "Law of Legal Fornication."

Beware, beware, Porto Rican young ladies! You see where the liberty of our times will lead you. Hear for the last time the said theologian: "Civil matrimony authorizes you to live in continuous fornication."

Never, never would I have thought that I should be compelled to write in such plain language, perhaps even repugnant; but the conduct of certain Porto Rican young ladies has reached a point where it appears as though they had lost their blushes and their shame. Unfortunates!!! The Lord have mercy on so much misery. Therefore, in view of what we are witnessing almost every day, I deem it my sacred duty to expose before the public this civil matrimony, or better, this civil concubinage, in the most repugnant and despicable light within my power, because it behooves all good Catholics to do their utmost to prevent the falling of souls in the hands of our common enemy, Satan.

Beware, therefore, I repeat, Porto Rican young ladies, do not allow yourselves to be deceived by vain promises. God above all the world. Meditate and reflect a little. You should make up your minds never to marry at all rather than unite in fornication. You will have followers. I am sure of it. I have heard several times these edifying words: "If I ever get married, it must be according to the Catholic way, and not according to the civil rite." May God reward the conduct of such young ladies.

You should spread, yes, spread these four ideas of our Catholic church to obtain the salvation of the poor who sink, and prevent the fall of those who are under the pressure of the furious waves of the sea of this world.