UNITED STATES of America,
Plaintiff,

v.

OUTER HARBOR DOCK & WHARF COMPANY, a corporation, Jerry H. Powell, B. F. Johnston (deceased), Charles L. Tilley, Ronald D. Gibbs, and A. F. Mortensen, Defendants.

No. 22984–CD.

United States District Court
S. D. California, Central Division.

Sept. 22, 1954.

338

Frank P. Doherty, Los Angeles, Cal., for Outer Harbor Dock & Wharf Co., Inc., Jerry H. Powell, B. F. Johnston, Ronald D. Gibbs, and A. F. Mortensen.

Frank B. Belcher, J. E. Simpson, Los Angeles, Cal., for Outer Harbor Dock & Wharf Co., Inc., and Charles L. Tilley.

YANKWICH, Chief Judge.

The indictment charges the Outer Harbor Dock and Wharf Company and five individual defendants with conspiracy.[1] Of the five defendants, B. F. Johnston is dead. So the action has proceeded against the corporation and the four individual defendants, its officers.

The conspiracy charge is that of knowingly and willfully making and causing to be made a false, fictitious and fraudulent representation and statement in a matter within the jurisdiction of a department and agency of the United States [2] by falsely representing and stating to the representatives of the Eleventh Naval District that "the defendant Outer Harbor Dock and Wharf Company was obligated under its lease with the City of Los Angeles to remove warehouse buildings and installations erected by the United States Navy on land leased by the said City to the defendant Outer Harbor Dock and Wharf Company, whereas, in truth and in fact, as the defendants well knew, the Harbor Department of the City of Los Angeles had agreed with defendants that said warehouse buildings and installations erected by the United States Navy would be accepted by the City of Los Angeles and that the Outer Harbor Dock and Wharf Company was not obligated to remove them from said land."

The case is thus reduced to one alleged representation,—namely that the Company was obligated to remove certain buildings and installations on land leased by the City, when in fact, *it was not so obligated.*

The government has closed its case. The defendants have moved for a judgment of acquittal under Rule 29(a) of

Laughlin E. Waters, U. S. Atty., Louis Lee Abbott, Asst. U. S. Atty., Los Angeles, Cal., Richard M. Darby, Asst. U. S. Atty., Pasadena, Cal., for plaintiff.

1. 18 U.S.C.A. § 371.

2. 18 U.S.C.A. § 1001.

the Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides, in part:

"The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."

This rule reenacted what had been the law before.

■ The higher courts have determined the quantum of proof necessary to warrant an acquittal at the conclusion of the Government's case. They are not in agreement as to wording, but our own circuit and others agree that whether proceeding under this rule or under the rule for a directed verdict obtaining before the Federal Rules of Criminal Procedure were adopted, the criterion is the same: the facts in the record must be such that the elements of the offense can be readily inferred.[3] And, generally, if, after taking the view of the evidence most favorable to the Government, there is substantial evidence in the record from which to infer the existence of a conspiracy and the participation of a particular defendant in it, the evidence is sufficient.[4]

■ The Court of Appeals for the District of Columbia, after analyzing the diverse manners in which the rule has been stated, gives the following summary which, I believe, correctly states the law:

"The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw

justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter. In a given case, particularly one of circumstantial evidence, that determination may depend upon the difference between pure speculation and legitimate inference from proven facts. * * *

"To be valid, the first part of the above-quoted statement from the Hammond case, supra [Hammond v. U. S., 75 U.S.App.D.C. 397, 127 F.2d 752], must be understood to mean that the judge cannot let a case go to the jury unless there is evidence of some fact which to a reasonable mind fairly excludes the hypothesis of innocence. The statement refers to the requisite presence of evidence, and not to the absence or effect of other evidence. The second part of the quoted statement means that if, upon the whole of the evidence, a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained."[5]

These criteria have the approval of our own Court of Appeals.[6]

■ In determining whether there exists the balance between guilt or innocence, of course, the Court may draw inferences from admitted facts, but inferences upon inferences cannot be made.

3. Mazurosky v. United States, 9 Cir., 1939, 100 F.2d 958.

4. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Schino v. United States, 9 Cir., 1953, 209 F.2d 67, 72; Swanee Soon Young Pang v. U. S., 9 Cir., 1953, 209 F.2d 245.

5. Curley v. United States, 1947, 81 U.S. App.D.C. 389, 160 F.2d 229, 232–233.

6. Stoppelli v. United States, 9 Cir., 1950, 183 F.2d 391, 393. And see, McGuire v. United States, 1948, 84 U.S.App.D.C. 64, 171 F.2d 136, 138; United States v. Aman, 7 Cir., 1954, 210 F.2d 344, 349.

As said by the Court of Appeals for the 8th Circuit:

> "As said by us in Nations v. United States, 8 Cir., 52 F.2d 97, 105, in an opinion by Judge Stone: 'Such double inferences are too remote to constitute evidence. As said by the Supreme Court in United States v. Ross, 92 U.S. 281, 283, 23 L.Ed. 707: "They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissibble. No inference of fact or of law is reliable drawn from premises which are uncertain." ' " [7]

That case was a Harrison Narcotics Act case against a physician. The Court of Appeals was considering the question whether the trial court erred in refusing to grant a judgment of acquittal. The Government had sought to prove *unlawful prescription* of narcotics from *mere possession*. The court said that from possession of narcotics it would have to infer illegal possession and from illegal possession it would have to infer an intention to violate the law in giving prescriptions when sound medical practice did not warrant it. It, therefore, reversed the case with direction to enter a judgment of acquittal.

The evidence before the Court in this case shows that the negotiations were carried on chiefly with the defendant Charles L. Tilley. And the testimony of the Government's three chief witnesses, Donald B. Radcliffe, Frank F. Mead and James Shlicta, related chiefly to the defendant Tilley. The only other person by whom direct statements were alleged to have been made is the defendant Jerry L. Powell, an attorney, who is reported to have made certain representations at a conference on March 6, 1951, held at Washington, D. C. concerning the obligation to the city to restore the premises in 1956. Knowledge of the other defendants is sought to be fastened on them through the fact that there exists correspondence showing that they knew of the position which Tilley as the General Manager of the corporation was taking in his negotiations with the Navy.

■ While an inference of conspiracy may be drawn from the simultaneous doing of similar acts by persons connected with the same corporation, I believe what has been designated as "parallelism of action" in proving conspiracy has been greatly abused. The Supreme Court has taken cognizance of this.[8] All the direct evidence shows here is that Powell and Tilley took the view that it was their obligation to "restore" the premises at the termination of the lease in 1956. There is no evidence in the record that even Tilley at any time used the phrase which is read into the indictment,—namely that the Company

> "was obligated under its lease with the City of Los Angeles to remove warehouse buildings and installations erected by the United States Navy on land leased by the City."

The testimony of all the Government's witnesses, so far as Tilley is concerned, shows that they were talking at all times about "restoring" the land to its previous condition. Indeed, I doubt if it could be inferred that anyone but Powell, who is a lawyer, ever used the legal phrasing which is in the indictment.

The Government has given the date of the beginning of the conspiracy as September 15, 1949, and continuing to the filing of the Indictment on July 15, 1953. While testimony as to the prior negotiations was introduced, no conversation prior to May 1, 1950, can be given any consideration except as background. And, admitting that Tilley and Powell had made statements at various times and that the other defendants may have known of them, their acts are consistent

---

7. Wesson v. United States, 8 Cir., 1949, 172 F.2d 931, 936. And see, Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 369–370; Johnson v. United States, 8 Cir., 1952, 195 F.2d 673, 676.

8. Theatre Enterprises v. Paramount Film Distributing Corp., 1954, 346 U.S. 537, 540–541, 74 S.Ct. 257.

with an individual position taken by them as individuals within their own sphere and not as a result of any conspiracy.

But assuming that the statements were made by all and that they were the result of concert of action, I am of the view that the statements were true. The Navy had a lease with the defendants from October 1, 1943, to June 30, 1944, which was renewable from year to year. In 1949, they began discussing the possibility of terminating the lease. In this lease, which the Government had a right to terminate on thirty days' written notice, the Navy obligated itself to remove the structures it had built and restore the premises to the condition existing at the time of entering the possession. (Lease Clause 8) The City of Los Angeles was *not* a party to this lease. Indeed, when it was requested to become a party to the modification of the lease between the Navy and the Corporation it declined to do so, the Manager of the Harbor Board taking the view that they had no contractual relations with the Navy and were not interested in entering into any by reason of the relationship between the Navy and the Corporation. The obligation of the Corporation stemmed from three contracts. The first one is dated April 4, 1922, and is an agreement compromising a law suit in which the following provision was made as to the restoration of the premises upon expiration of the lease.

"Expiration

"Upon the expiration of said wharf franchise, and upon the expiration of said permit and lease, respectively, *all wharves, piers, docks, slips, bulkheads, sea walls and channels heretofore* constructed, or which may be constructed or maintained by the Company, upon the premises covered by said wharf franchise, or by said lease or permit, respectively, shall be and become the property of the City of Los Angeles without compensation therefor to the Company, or its successor in interest. *That all other structures, improve-ments, machinery, appliances, apparatus or adjuncts now on the premises covered by said wharf franchise, or upon the premises covered by said permit or lease, or which may be constructed or placed thereon during the terms of said franchise, permit and lease, respectively, shall remain the property of the Company, and shall be removed therefrom by the Company, at its own expense, upon the expiration of said franchise, permit and lease, respectively.*" (Emphasis added.)

On November 23, 1949, the Board of Harbor Commissioners adopted a resolution proposed by the Harbor Engineer and approved by the General Manager, which provided certain conditions upon which the buildings on the premises might be accepted in lieu of restoration:

"As a result of the survey, this office recommends that the Outer Harbor Dock and Wharf Company be advised, by the Board of Harbor Commissioners, that the retention of all of the Navy warehouse structures, small offices, and other small buildings, including pavement and rail facilities, but excluding all refrigerators—as shown on attached plan—,will be accepted, by the Board of Harbor Commissioners, as constituting restoration of the site, all subject to and with the understanding that for and during the remainder of the Outer Harbor Dock and Wharf Company leasehold period, said structures and improvements—whatever exposed to the weather—will be adequately preserved, by the Outer Harbor Dock and Wharf Company at its sole expense, against other than normal deterioration, by painting these structures and improvements with first-class linseed oil paints that will meet the Harbor Department paint standards, at least twice during said remaining leasehold period, and by applying, wherever necessary and if necessary, roofing mastics, asphalts, or coverings as may be required from

time to time to prevent roof leaks that would cause deterioration to the underlying timber, steel, or other roofing material supports, and the doing of other maintenance work, as required, to safeguard the properties from other than normal wear and tear from the elements; the need for repair work, maintenance painting, etc., to be determined as the result of inspections by the Harbor Department, and to be undertaken by the Outer Harbor Dock and Wharf Company within a period of four months after the giving of notice by the Harbor Department of such needs."

This was adopted by the Board, but it was amended to include all refrigerators which had been excluded from the report. On May 1, 1950, the Harbor Commission adopted Order No. 2313 which embodied the conditions of this Resolution in a formal contract extending the leasehold. The Preamble recited:

"Whereas, it is deemed to be for the mutual benefit of the City and the Company to extend and amplify certain privileges heretofore granted the Company, for the period beginning April 4, 1952, and expiring February 13, 1956, in order to conform all rights and privileges held by said Company in the said lands to the expiration date of said lease of February 14, 1906; and * *". (Order No. 2313, p. 75)

Two clauses in this Agreement have great significance. They are here copied:

"13. That upon the expiration of the aforesaid term of this lease, permit and franchise the grantee shall immediately quit and surrender possession of said premises to the City of Los Angeles, and shall, prior to the termination hereof, at the cost and expense of the grantee, remove all improvements of any kind whatsoever maintained on said premises by the grantee under the hereinbefore referred to lease executed by the former City of San Pedro on February 14, 1906, under the lease, permit and franchise granted by said Order No. 643 of the Board of Harbor Commissioners of the City of Los Angeles, or under this lease, permit and *franchise, except wharves, piers, docks, slips, bulkheads, seawalls, and channels, and except those structures erected by the United States Navy which said Board of Harbor Commissioners, by official action taken at its meeting held November 23, 1949, authorized to be left in place under certain maintenance conditions set forth in said action.* * * * (Emphasis added.)

"17. That upon the *neglect, failure or refusal by the grantee to comply with any of the terms* or *conditions of this permit or franchise, after thirty (30) days' notice and demand in writing by the Board of Harbor Commissioners to comply with any such terms or conditions, said Board may* thereupon, at its option, *declare this permit and franchise forfeited,* and may *forthwith enter* upon said *premises, using all reasonable force so to do,* and *exclude said grantee from further use of said premises and all improvements thereon, and said grantee shall thereupon and immediately surrender all rights in and to the same, and this permit and franchise shall be deemed to be, and shall remain, null, void, and of no effect.* Upon any such forfeiture *any and all* buildings, *structures and improvements of whatsoever* character *maintained under, through or because* of or *pursuant to the terms of this permit and franchise shall immediately ipso facto either become the property of the City of Los Angeles free and clear of any claim of any kind or nature of the grantee or its successors in interest, or become removable by the Board of Harbor Commissioners at the sole* expense of the grantee, at

*the option of said Board."* (Order No. 2313) (Emphasis added.)

This Order was accepted by the Corporation and it agreed to abide by and observe "each and every of the terms and conditions thereof". These documents merge into one another.

█ It is the law of contracts of California that a contract may refer to another contract for details or conditions. When this is done, the contracts referred to must be considered as a part of the contract in which the reference is made. And it is not necessary that language be used incorporating them into the second contract or that they be attached to it.[9]

Proper reference being made the contracts *are considered merged,—to be construed and interpreted as one.*[10]

The documents under consideration in this case must be construed in the light of these principles. They all point to a substitution of certain conditions to become effective in 1956, *at the termination of the lease.* Until such termination, the Navy-erected buildings had to be maintained on the premises according to certain standards set by the City. Title to the buildings remained in the corporation. None passed to the City. Contrary to the allegations of the indictment the City has not, in any of the instruments, agreed to accept the buildings. It is only at the termination in 1956—seven years hence, if the City was satisfied that the buildings had been maintained in the condition prescribed by it and the lease had not been broken in other repects, that it obligated itself to accept the buildings in lieu of restoration and re-

lieve the corporation then of its duty to restore. The corporation was responsible not only for the maintenance of the buildings, but also for their retention on the premises. If a fire had destroyed them, or any of them, the City would not have been required to accept the award of the fire insurance company for the destroyed structure. It could have insisted on replacement.

In the meantime, the company, after the termination by the Navy, would be confronted with the problem of what to do with the buildings between the date of termination and the end of its lease. It had to either seek tenants who could use the Navy installations "as they were", or remodel them for occupancy to suit the needs of other tenants,—in either of which case they had to comply with the State and City building requirements with which the Navy had not complied,—or allow the buildings to remain unoccupied and guard them. Each of these situations involved obligations which the corporation had to assume. So, on the whole, there was a continuing assumption of liability on the part of the corporation before the conditional agreement of the city matured into an unconditional acceptance of the buildings. No other reasonable construction can be given to these instruments if they are studied as a whole. It is only when certain phrases are wrested from their context and not related to other documents to which they refer that an interpretation can be placed upon these clauses that they were anything but a conditional understanding *that upon certain contingencies happening,* seven years

---

**9.** Haughawout v. Raymond, 1905, 148 Cal. 311, 83 P. 53 (in which a resolution of intention to construct a public sewer referred to plans, profiles and specifications not annexed); Beedy v. San Mateo Hotel Co., 1915, 27 Cal.App. 653, 661, 150 P. 810 (in which a stock subscription list referred to a "list of subscribers" which was not annexed); Roberts v. Security Trust & Savings Bank, 1925, 196 Cal. 557, 238 P. 673 (in which a faithful performance bond on a building contract referred to a building contract without details); Bell v. Rio Grande Oil Co., 1937,

23 Cal.App.2d 436, 440, 73 P.2d 662 (in which an agreement for a lease stated that it was "to be Oil Age Form 86, with modifications to conform to this letter); Holbrook v. Fazio, 1948, 84 Cal.App.2d 700, 191 P.2d 123 (where the time and conditions of payment under a subcontract were determined by the reference therein to the prime contract).

**10.** See, Valley Construction Co. v. City of Calistoga, 1946, 72 Cal.App.2d 839, 841–842, 165 P.2d 521.

hence, *the City might accept the buildings in lieu of restoration.*

So, assuming that the representation was made, the documentary evidence in the record shows that it was true. There is no substance to the argument that nowhere in these contracts is the duty spelled out for the company to remove any buildings. The language of the clauses I have read precludes such interpretation. Indeed, Clause 17 provides that upon the forfeiture of the lease for any cause, the City shall have the right to remove the buildings

> "at the sole expense of the grantee at the option of said Board."

This clause has a greater compulsive force than a direct obligation to remove —default of which might result only in a suit for damages.

■ However, I believe that when all these documents are correctly and reasonably interpreted, we are confronted with the proposition that where one side undertakes an obligation which is not complete without a mutually corresponding obligation on the other side, the courts will read such obligation into the agreement even though it is not spelled out in so many words.[11] There are many cases in California dealing with the subject.[12] Thus in a case relating to the installation of a tank on a building, where the plaintiff was prevented from installing the tank because the contractor would not allow the work to be done by non-union labor, the Court held that the plaintiff was not bound by any understanding between the contractor and the owner as to the type of labor, saying:

> "Where one has assumed a positive obligation the corresponding obligation not expressed in terms will nevertheless be implied as resting upon the party to whom the agreement runs to be answerable for all

losses caused by delays which his control of the work should make him responsible for. Norcross v. Wills, 198 N.Y. 336, 91 N.E. 803. If a contractor is prevented from completing his contract by the fault of the other party thereto, he is unquestionably entitled to recover for the work he has performed, and for all damages suffered by him in consequence of such prevention. Each party to a contract impliedly agrees not to prevent the other from performing, or to render performance impossible by any act of his own." [13]

One of California's Courts of Appeals has summed up the conditions under which covenants will be implied, in this manner:

> "Summarized, therefore, the rules deducible from the foregoing authorities controlling the exercise of judicial authority to insert implied covenants may be stated as follows: (1) The implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract." [14]

So, assuming that there is no direct obligation on the part of the corporation to remove the buildings, it would be inferred from the terms of the various contracts. The City's right to remove

---

11. Cal.Civ.Code, § 1655.

12. Burr v. Western States Life Ins. Co., 1931, 211 Cal. 568, 574, 296 P. 273.

13. Steel Tank & Pipe Co. of California v. Pacific Fire Extinguisher Co., 1924, 69 Cal.App. 225, 229, 230 P. 978, 980.

14. Cousins Inv. Co. v. Hastings Clothing Co., 1941, 45 Cal.App.2d 141, 149, 113 P.2d 878, 882. To the same effect is Masciotra v. Harlow, 1951, 105 Cal.App. 2d 376, 381, 233 P.2d 586.

was optional and, certainly, the defendant, to save itself from a removal by the City under circumstances and for costs which it cannot control, would be compelled to adopt the alternative under the terms of Order No. 2313 and undertake to do the work itself.

 Whichever of these considerations apply, it is quite evident that the representation, if made, was true,—the corporation was obligated to remove the buildings at the time the representations were made. Not until the happening of many contingencies, seven years hence, could the optional alternative be turned into an unconditional acceptance by the City. And there is no fraud in stating so conditioned a promise in the terms attributed to the defendants all of whom, except Powell, were laymen. Criminal fraud is not to be inferred from an erroneous expression of opinion as to the effect of a contract. Here, the opinion happens to be correct.

One of the dictionary definitions of "restoration" is "a bringing back to a former, original, normal or unimpaired condition." So when the defendants Tilley and Powell talked of "restoration", they were not' talking of restoration of Navy warehouses. They were referring to the continuing obligation to place the premises in the former condition in 1956. Only events which could happen in 1956, could determine whether the City would relieve them of the obligation.

The Government's contrary conclusion is based upon the inference that the city had already *agreed* to accept the buildings in lieu of removal, that, therefore, there was no obligation on the part of the Company to remove them. From this, the further inference is drawn that the representation must, on this account, be deemed false. Clearly, an inference upon inference,—a procedure which the courts have condemned as insufficient to base a prima facie case on.[15]

When these inferences are rejected, as they must be, there is no evidence of conspiracy to misrepresent the facts, the

statements, if made, are reasonable and permissible conclusions as to the legal effect of the documents, and are, in fact, true. And there is no evidence whatsoever that the defendants did not, in fact, believe in their truth.

I find the defendants not guilty.

---

15. Wesson v. United States, supra.