Paul O. JOHNSON, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19296.

United States Court of Appeals
Eighth Circuit.

April 21, 1969.

Horace S. Haseltine, of Lincoln, Haseltine, Forehand & Springer, Springfield, Mo., for appellant. Carl E. Yates, Springfield, Mo., and A. L. Shortridge, Joplin, Mo., were on the brief with Horace S. Haseltine, Springfield, Mo.

Bruce C. Houdek, Special Asst. U. S. Atty., Kansas City, Mo., for appellee; Calvin K. Hamilton, U. S. Atty., was on the brief with Bruce C. Houdek, Kansas City, Mo.

Before BLACKMUN, MEHAFFY and HEANEY, Circuit Judges.

**HEANEY, Circuit Judge.**

The defendant was convicted on two counts of a four-count indictment:[1] (1) filing a false claim on October 8, 1963, against the United States in violation of 18 U.S.C. § 287[2] (Count III of the indictment), and (2) making false statements on October 8, 1963, to a department or agency of the United States in violation of 18 U.S.C. § 1001 (Count IV of the indictment).[3]

The defendant received similar sentences on each count, imprisonment for sixty days and a fine of $10,000, the sentences to be served concurrently and the total fine to be limited to $10,000.

The defendant's request for a judgment of acquittal notwithstanding the jury verdict or, in the alternative, a new trial, was denied by the trial judge, Elmo B. Hunter. United States v. Johnson, 284 F.Supp. 273 (W.Mo.1968).

The defendant gives four principal reasons why his conviction should be reversed on this appeal: (1) The trial court should have required the government to elect between Counts III and IV. The

---

1. The defendant was acquitted on Counts I and II. These counts charged that the defendant had, in 1962, made a false claim in violation of § 287 (Count I) and a false statement in violation of § 1001 (Count II). Specifically, they charged that, in 1962, the defendant, in violation of the soil bank contract, lost control of approximately thirty-nine acres of land upon which the claim was based by a sale of it to Southern Heights Lumber Company. The defendant testified that the transaction with Southern Heights Lumber Company was intended to be a security transaction not a sale. An officer of Southern Heights Lumber Company, Rex Kreider, gave similar testimony concerning the intent of the parties. The jury presumably accepted this version of the transaction notwithstanding the fact that Kreider, in the name of Southern Heights Lumber Company's successor, subsequently entered into several contracts for the sale of approximately twenty of the thirty-nine acres.

2. "§ 287. *False, fictitious or fraudulent claims*
"Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both."
18 U.S.C. § 287.

3. "§ 1001. *Statements or entries generally*
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
* * *"
18 U.S.C. § 1001.

conviction on both counts subjected the defendant to double jeopardy. (2) The indictment failed to allege facts constituting an offense under §§ 287 or 1001. The evidence to convict on either charge was insufficient. (3) The trial court deprived the defendant of an opportunity to assert a permissible defense—that of substantial performance. (4) Sections 287 and 1001 are unconstitutionally indefinite and vague as applied to the defendant's actions. Thus, his conviction is violative of the due process clause of the Constitution of the United States.

There is no showing that the defendant was prejudiced by being required to stand trial on both counts. Wangrow v. United States, 399 F.2d 106, 112 (8th Cir.), cert. denied, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968). As the sentences on Counts III and IV are concurrent, it is unnecessary for us to consider the merits of the defendant's contention that conviction on both counts subjected him to double jeopardy. Chavez v. United States, 387 F.2d 937, 939 (9th Cir. 1967).[4]

In view of the concurrency of the sentences, we limit our review to those facts and issues relating to the defendant's conviction under Count III. In summarizing the facts, we view the evidence in the light most favorable to the government.

## THE INDICTMENT

Count III of the indictment charged that on October 8, 1963, the defendant presented to the Agricultural Stabilization and Conservation County Committee of Greene County, Missouri, a claim for $4,317.20 pursuant to the Soil Bank Conservation Reserve Program, knowing that the claim was false, fictitious and fraudulent and that he was not entitled

to that sum because: (1) he had lost control of ninety acres of reserved land, (2) he had destroyed approved cover on reserved land by constructing roads, sewers, water lines, gas lines and houses, and (3) he had caused a crop of hay to be harvested from the reserved land, all in violation of § 287.

## THE FACTS

The defendant and his wife were the owners of 450 acres of land in Springfield, Missouri. On December 11, 1959, they entered into a soil bank contract with the Greene County Agriculture and Stabilization Committee.[5] The contract covered the period January 1, 1960, through December 31, 1969. By the terms of the contract, 282 acres were designated as a conservation reserve. This acreage was divided between four fields: A, B, C and D. The contract required that the owners establish and maintain protective vegetative cover of the reserve. It also provided: that no crop could be harvested from the conservation reserve during the contract term; that loss of control of all or part of the land by sale, or otherwise, terminated the contract with respect to the acreage over which the control was lost; that the owners were to report promptly to the Greene County ASC the sale of any land in the reserve; and, that the owners should not "file a claim for a payment to which he knows he is not entitled."

At the time the contract was signed, an acreage reporter for the County ASC checked the fields for acreage, cover, previous land use and eligibility. The reporter told the defendant that if he developed any part of the reserve area, the developed portion would be ineligible for benefits. He was also told that before he undertook development of any part of the

---

4. The defendant's contention is open to question. See, Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1931); Hattaway v. United States, 399 F.2d 431 (5th Cir. 1968); Cardarella v. United States, 375 F.2d 222 (8th Cir.),

cert. denied, 389 U.S. 882, 88 S.Ct. 129, 19 L.Ed.2d 176 (1967).

5. The terms of the contract were essentially a reflection of the regulations in force at that time. 24 Fed.Reg. 7987–8001 (1959).

reserve, he should discuss the matter with the county committee.

In April, 1960, the defendant was told by the County ASC Manager that a sale of a part of the reserve to a development corporation, of which the defendant was a stockholder, would terminate the contract as to the portion sold.

In July, 1961, an employee of the Greene County ASC conducted a compliance check. This check indicated that a tennis court and a tent had been placed on Field B, and that a number of homes had been built on Field C. The county committee subsequently confirmed the employee's findings. The committee then contacted the defendant and informed him that he was required to make application to take the land out of the contract before development was undertaken. The committee, nevertheless, permitted the contract to be modified and reduced the 1961 payments accordingly.

In 1962, the defendant's land was again inspected. The inspection disclosed that additional homes had been built on the reserve, that a street had been laid out in Field C and that Field B was being used for a park and playground. The defendant was again warned that no construction was to be started without the land being first taken out of the contract. The committee, nonetheless, permitted modification of the contract by eliminating Field B from the reserve, reducing the acreage in Field C and reducing payments. Two hundred and fifty-one acres of land remained in the reserve after the 1961 and 1962 modifications.

In November of 1961, the defendant and his wife executed a deed of trust covering thirty-nine acres of land in Fields C and D. This deed of trust and an ac-

companying promissory note were transferred to Rex Kreider and wife. The next year, the promissory note was cancelled and the property conveyed by the deed of trust was released from the lien. A warranty deed was then recorded which purported to convey the thirty-nine acres to Southern Heights Lumber Company of which Kreider was an officer. The defendant and Kreider claimed that this transaction was a security agreement, an assertion apparently accepted by the jury.[6]

In June of 1963, the defendant entered into a contract for sale with Kenneth Cantrell for thirty-three acres of Field C. In July, 1963, the defendant entered into a similar contract with Ezra and Henry Gibson for fifty-seven acres of the same field.

On October 8, 1963, the defendant went to the Greene County ASC office to obtain his soil bank check for 1963. The members of the committee, having heard rumors that the defendant had sold land in the conservation reserve, asked him if he had sold any of the land, and the defendant replied, "No." The defendant stated that he had contracted to sell 105 acres for development, but that the contract would not take effect until 1964. The defendant was again informed that he could not break cover, dig, build streets, lay sewer lines or do similar work until after the first of the year; and that if he did, he would have to refund any money drawn.

The defendant did not inform the committee that he was then installing sewers and gas and water laterals on Fields C and D, or that he intended to continue to do so during the remaining months of the year.

---

6. As noted in n. 1, the defendant was acquitted on Counts I and II which were predicated upon this transaction. In the presentation of its case, the government, in an effort to establish loss of control, introduced evidence as to other transactions involving the thirty-nine acres. In June of 1963, the defendant and his wife and Kreider and his wife entered into a contract for the sale of land to Kenneth Cantrell. In July Kreider's company entered into a new contract in which it agreed to sell a designated number of lots to Cantrell. All of the lots were located in the disputed thirty-nine acres. Also in July, Kreider's company contracted to sell approximately three of the thirty-nine acres to Ezra and Henry Gibson. In September, Kreider and the defendant exchanged quit claim deeds covering land in the thirty-nine acres.

The defendant then signed the Application and Annual Payment Statement shown here, and was given a certified check for $4,317.20.

---

FORM ASCS-822 (SOIL BANK)
(8-9-61)

SOIL BANK - CONSERVATION RESERVE PROGRAM
APPLICATION AND ANNUAL PAYMENT STATEMENT

U.S. DEPARTMENT OF AGRICULTURE
AGRIC. STAB. AND CONS. SERVICE

CODE AND FARM NO. 44-039 V-653

CONTRACT NO. 304A

PROGRAM YEAR 1962

HAVE ALL ACREAGE ALLOTMENTS (OR BASES) BEEN COMPLIED WITH? YES [X] NO [ ]

PART I - COMPLIANCE DATA AND COMPUTATION OF PAYMENT

1. DESIGNATED CONSERVATION RESERVE 251.0
2. SOIL BANK BASE Whole Farm
3. PERMITTED ACREAGE 0
4. MEASURED ACREAGE 0
5. IF 4 IS LARGER THAN 3, ENTER DIFFERENCE

| LINE NO. | CONTRACTED ACREAGE | RATE PER ACRE | AMOUNT (COL. (B) TIMES COL. (C)) | DEDUCTION IF PERMITTED ACREAGE EXCEEDED (FACTOR) TIMES COL. (D) | COL. (D) MINUS COL. (E) | PERCENTAGE SHARE | PAYMENT SHARE | SET-OFFS—ASSIGNMENTS | PERCENTAGE SHARE | PAYMENT SHARE |
|---|---|---|---|---|---|---|---|---|---|---|
| (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | | (I) | (J) |
| 1 | 208.6 | $17.20 | $3587.92 | $ | $ | | % $ | | | % $ |
| 2 | 42.4 | 17.20 | 729.28 | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 TOTAL | | | $4317.20 | $ | $ | 100 | | GROSS $4317.20 | | GROSS $ |

SET-OFFS—ASSIGNMENTS

PART II - PRODUCER'S CERTIFICATION

I hereby certify that for the program year indicated above I have complied with and will comply with all the requirements under the Conservation Reserve Program and that the gross payment shown hereon to be due me, is correct and will not cause the total of all the gross annual payments due me on all farms in which I have an interest for the program year indicated above, to exceed $5,000. I hereby apply for the payment shown hereon to be due me.

DO YOU HAVE AN INTEREST IN THE ANNUAL PAYMENT UNDER THE CONSERVATION RESERVE PROGRAM ON ANY OTHER FARM IN THIS COUNTY OR ANOTHER COUNTY OR STATE? YES [ ] NO [X]
(If "yes", list location of farm on reverse side.)

PRODUCER'S SIGNATURE DATE 10/5/63

DO YOU HAVE AN INTEREST IN THE ANNUAL PAYMENT UNDER THE CONSERVATION RESERVE PROGRAM ON ANY OTHER FARM IN THIS COUNTY OR ANOTHER COUNTY OR STATE? YES [ ] NO [ ]
(If "yes", list location of farm on reverse side.)

PRODUCER'S SIGNATURE DATE

PRODUCER (NAME AND ADDRESS)
Paul O. Johnson
1954 S. Glenstone
Springfield, Mo.

NET PAYM'T $4317.20

PART III - APPROVAL FOR PAYMENT

All requirements under the Conservation Reserve Program have been complied with an issuance of sight drafts to the payees in the amounts shown in Part I hereof is approved as of the date below.

FOR ASC COUNTY COMMITTEE (Signature) DATE 10-8-63

PRODUCER (NAME AND ADDRESS)

NET PAYM'T $

PART IV - SIGHT DRAFTS ISSUED

DRAFT NO'S. DATE OF DRAFTS 10/5/63

After signing the application, the defendant was again warned by an ASC employee not to break or destroy any of the cover, or put any streets or sewers on the land until after the first of the year.

Installation of gas, water laterals and sewers on Fields C and D, and construction of homes and streets on Field C continued during the remainder of the year.

On November 21, 1963, the defendant conveyed the fifty-seven acres of land to the Gibsons.[7]

An employee of the defendant harvested hay from Field A, two-thirds of which he took home and one-third of which was placed in the defendant's barn.

We turn to a discussion of the defendant's contentions relating to Count III. In so doing, we note that they were given thoughtful consideration by Judge Hunter and were properly decided by him. We, therefore, will not reconsider them in as much detail here.

## AN INDICTABLE OFFENSE WAS NEITHER ALLEGED NOR PROVED

■ The heart of the defendant's argument is that his submission of the application for payment did not constitute submitting a false claim within the meaning of § 287. He argues that his submission amounted to nothing more than a statement that according to his understanding of the contract between him and the government, he was entitled to receive a payment of $4,317.20. He contends that the trial court's decision establishes, for the first time, a rule that a mere declaration that a person has complied with his contract will support a criminal fraud charge. He cites United States v. Diogo, 320 F.2d 898 (2d Cir. 1963); United States v. Outer Harbor Dock & Wharf Company, 124 F.Supp. 337

(S.D.Cal.1954); and 23 Am.Jur., Fraud and Deceit, § 27, in support of his position.

The trial court properly rejected the defendant's arguments. United States v. Johnson, supra 284 F.Supp. at 278–279. The court submitted questions as to the falsity of the claim and the defendant's intent to the jury with appropriate instructions.

The jury was justified in finding that the defendant's claim was false and that it was not based on a "reasonable and permissible [conclusion] as to the legal effect of [the contract]," United States v. Outer Harbor Dock & Wharf Company, supra 124 F.Supp. at 345.

The jury was also justified in finding that the defendant knew that the claim was false and that he intended to defraud the government. The defendant applied for and accepted payment: (1) knowing that he had lost control over a portion of the reserved land by selling it; (2) knowing that he had destroyed cover on the reserved land by constructing roads, utilities and homes on it; (3) knowing that he had harvested a crop of hay on the reserved land; (4) knowing that these acts were violative of his contract with the government; (5) knowing that the government was unaware of the violations; and (6) knowing that he was not entitled to receive the sum of $4,317.20.

The defendant's reliance on Diogo and Outer Harbor is misplaced. Those cases involved prosecutions under § 1001. Assuming, however, that the general principles enunciated in them are equally applicable to prosecutions under § 287, they give no comfort to the defendant.

In Diogo, the defendants were convicted of having falsely represented to immigration authorities, in violation of 18 U.S.C. § 1001 and § 1546, that they were married. The Court held that the gov-

7. Before this date, the Gibsons had entered into several contracts for developments on the fifty-seven acres. On October 15, 1963, Henry Gibson entered into a contract for the installation of water and gas laterals. On October 26, 1963, the Gibsons entered into a contract for the installation of sanitary sewers and concrete paving and integral curbing. All these projects were started and many of them completed before the end of the year.

The record does not reflect when the property sold to Cantrell was conveyed.

ernment had failed to establish that the statements of each defendant regarding his marital status was false or that the statements were known by the defendants to be false at the time they were made. · The Court stated:

"In construing these statements, it is well established that we must look to the meaning intended by the appellants themselves, rather than to the interpretation of the statements which the immigration authorities *did in fact make*, or even to the interpretation which the authorities *might reasonably have made.* * * *

* * * * * *

"We do not suggest that a court must accept as conclusive the meaning which a defendant, in a prosecution such as this, ascribes to the words he has used. If this were the rule to be applied, every person accused of perjury or false representations could assert his understanding of the words used in such a way as to preclude any possibility of conviction. * * * In a prosecution for perjury or false representation, absent fundamental ambiguity of the kind found in Lattimore, the question of what a defendant meant when he made his representation will normally be for the jury. * * * Where, as here, however, no evidence is presented on the question, it is incumbent upon the Government to negative any reasonable interpretation that would make the defendant's statement factually correct."

United States v. Diogo, *supra* 320 F.2d at 905–906, 907 (Emphasis included.).

Here, the evidence established that the defendant's claim was false and that he knew of its falsity. The government effectively negated any construction of the contract that would make the defendant's statement factually correct.

In *Upper Harbor*, the government charged that the defendants had falsely represented to the government that they were obligated under a lease with the City of Los Angeles to remove warehouse buildings and installations erected by the Navy on land leased by the City to the defendant company. The District Court held that the defendant company was so obligated; therefore, there had been no misrepresentation. In so finding, it commented that criminal fraud was not to be inferred from a reasonable and permissible conclusion as to the legal effect of a contract. United States v. Outer Harbor Dock & Wharf Company, *supra* 124 F.Supp. at 345.

In the instant case, there was no such "reasonable and permissible conclusion" in that the defendant knew that he was violating the terms of the contract. The most that can be said for his defense is that he might have had reason to expect that his 1963 violations would be treated in the same manner as the earlier ones.

The defendant's contention, that there are no other cases involving prosecutions under § 287 or its predecessor for failure to comply with the terms of a contract with the government, is without merit. See, Imperial Meat Company v. United States, 316 F.2d 435 (10th Cir.), cert. denied, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963); United States v. United States Cartridge Co., 95 F.Supp. 384, 393 (E.D.Mo.1950), aff'd, 198 F.2d 456 (8th Cir. 1952), cert. denied, 345 U.S. 910, 73 S.Ct. 645, 97 L.Ed. 1345 (1953).

## THE DEFENSE OF SUBSTANTIALITY

The defendant argues that he was deprived of the opportunity to present defenses essential to his acquittal: (1) he was not permitted to show that the government was seeking to cancel the conservation contract and assess penalties in a pending civil proceeding, and (2) he was not permitted to show that the actions serving as the basis for the indictment were *not of such a substantial nature* as to justify terminating the contract or assessing a civil penalty against him and, thus, could not serve as the basis for an indictment under § 287. He relies on Shay v. Agricultural Stab. & Conserv., State Committee for Ariz., 299 F.2d 516 (9th Cir. 1962), and United

**46**

States v. Maxwell, 278 F.2d 206 (8th Cir. 1960).

█ The trial court properly refused to permit evidence as to the pending civil case. It pointed out that the defendant's purpose in submitting this evidence was to cause the jury to believe that the defendant would be sufficiently punished in the civil proceeding. United States v. Johnson, *supra* 284 F.Supp. at 284–285.

█ The fact that remedies are provided by statute for breach of the contract does not negate the right of the government to indict and convict under § 287 if the elements of the crime are established. United States v. Gilliland, 312 U.S. 86, 95–96, 61 S.Ct. 518, 85 L.Ed. 598 (1941); Cohen v. United States, 201 F. 2d 386, 392, 393 (9th Cir.), cert. denied, 345 U.S. 951, 73 S.Ct. 864, 97 L.Ed. 1374 (1953). It follows that evidence as to the pending civil proceedings is immaterial.

█ Questions of materiality are for the trial court. Its rulings will not be disturbed by this Court unless there is a clear showing of an abuse of discretion. No such showing has been made here.

█ Further, we are convinced, as was the trial court, that the defendant was given an opportunity to prove that any acts of noncompliance were immaterial, unknowing, and not intended to defraud the government.

The court did, as the defendant argues, instruct the jury: (1) that the defendant was required to maintain cover, (2) that he was prohibited from harvesting crops, and (3) that he was required to maintain control of the land. It further instructed, however, that the defendant could not be found guilty unless the government proved beyond a reasonable doubt:

" * * * 1.) That the defendant did make or present a claim to a department or agency of the United States. 2) That such claim was false, fictitious, and fraudulent and material. 3)

That the defendant knew at the time that the claim was false, fictitious, and fraudulent. 4) That the claim was made upon or against the United States or any department or agency thereof."

The court also permitted the defendant to argue at length that any violations of the contract by him had been trivial, immaterial and insubstantial:

" * * * Mr. Wickhiser told you what was involved, about three or three and a half acres that was disturbed by the laying of some laterals—say three acres. That's three times seventeen dollars and twenty cents, or fifty-four dollars and sixty cents for a part of a year—not more than a third of a year, probably seventeen dollars and twenty cents. This is what this whole lawsuit it about. Now, when we weigh that, is that material? * * *

* * * * * *

" * * * Then we come into this hay business. They come around November 12th, 1963, or a day or so before, the man comes around and he asks Mr. Johnson if he can cut the hay, and he says: 'You'll have to go down and talk to the soil bank.' They go down and the man comes out with a form prepared dated November 12th, 1963, saying that he's got a hundred and thirty-nine acres of hay on field D–1, 2 or 3 or something like that, and Mr. Johnson signs it. As far as he knows, he can't carry in his memory the maps or plats or that entire tract to know what was taken out or what was not. He was told that the soil bank people had said you can cut a hundred and thirty-nine acres of hay, and he paid for it. The soil bank people would have paid for it. Now, that's what that hay amounted to. * * * "

The defendant's reliance on *Shay* and *Maxwell* is misplaced. In *Maxwell*, this Court held that a state ASC committee is prohibited by statute [8] from canceling a conservation reserve contract or impos-

8. Soil Bank Program, ch. 327, § 123, 70 Stat. 198; Soil Bank Program, ch. 327, § 103, 70 Stat. 189; Soil Bank Program, ch. 327, § 107, 70 Stat. 191.

ing a statutory fifty per cent penalty for a knowing and willful violation unless the nature of the violation is such as to defeat or substantially impair the purposes of the contract. We noted that lesser violations are to be adjusted as provided by law.[9] We stated that the trial court was completely justified in concluding that the violations were trivial and did not impair the purposes of the contract. —(Six colts strayed onto the reserve acres on a few occasions.) Our holding was required by the specific terms of the statute. Section 287 imposes no such obligation.

Similarly, *Shay* dealt with the specific requirements of the statute. In *Shay*, the District Court had affirmed the determination of the local committee that the defendants should be required to refund the entire payment received by them under a soil bank contract for grazing violations. The Ninth Circuit reversed and remanded holding that the judgment was erroneous in that the local committee had failed to making a finding, as required by the statute, that the particular violation was of such a nature as to warrant termination of the particular contract. That is, its nature was such as to defeat or substantially impair the purpose of the particular contract.

## THE CONSTITUTIONALITY OF § 287

The defendant argues that § 287 cannot be constitutionally applied to the defendant under the facts of this case because: (1) the defendant was not warned in the contract or the application that he would subject himself to criminal penalties by stating that he had fully complied with his contract when in fact he had not so complied; (2) the section uses language so general and indefinite as to embrace not only acts commonly recognized as reprehensible, but also others which it is unreasonable to presume were intended to be criminal; and (3) the local ASC committee was given uncontrolled discretion to determine if land could be used in the last six months.

The constitutional vice, in a vague or indefinite statute, is the injustice to the accused in placing him on trial for an offense of whose nature he was given no fair warning. See, American Communications Asso., CIO v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948). It is true that, in the instant case, the claim statement itself contained no warning of criminal ramifications of falsely certifying that the requirements of the Conservation Reserve Program had been and would continue to be carried out, but none was required. Anyone signing the required claim statement was suitably charged with notice of the consequences of knowingly and willfully falsifying such statement. See, United States v. Gilliland, *supra* 312 U.S. at 91, 61 S.Ct. 518.

Generally, under our system of criminal law, an individual is only punished when he has the requisite criminal intent accompanying the performance of the act. To have this requisite intent, the individual must be aware that what he is doing is wrong. See, Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). But, this is not to say that he must have exact knowledge of the relevant criminal provisions governing his conduct. The defendant here was charged with knowingly making a false claim to a government agency. Sufficient evidence was introduced to establish that the defendant was well aware of the essential requirements of the contract with the government and that he acted in complete disregard of those requirements both before and after making the claim. The jury was thoroughly instructed that they must find that the defendant intentionally made false, fictitious and fraudulent claims and statements to find him guilty. The requirement that the government prove, as an essential element of their case, that the defendant's conduct was "willful" relieves the statute of the objection that it

---

9. Soil Bank Program, ch. 327, § 103, 70 Stat. 189.

punished without adequate warning. See, American Communications Asso. v. Douds, *supra* 339 U.S. at 412, 70 S.Ct. 674; United States v. Houcks, 224 F. Supp. 778 (W.D.Mo.1963).

■ The defendant also contends that, as applied in this case, §§ 287 and 1001 are unconstitutional because the local committee was given the uncontrolled discretion to determine if land could be used in the last six months of the contract; therefore, delegating to them the power of determining whether a crime had been committed. This contention is without merit because no such uncontrolled discretion existed in the instant case. As the trial court correctly pointed out, the power to grant permission to use restricted lands only exists in the last six months of the contract period and that 1969, not 1963, was the last year of the contract. United States v. Johnson, *supra* 284 F.Supp. at 284.

Affirmed.