UNITED STATES of America, Appellee,

v.

Lyle B. SNIDER, Appellant.

UNITED STATES of America, Appellee,

v.

Lyle B. SNIDER, and Sue T. Snider, Appellants.

Nos. 73–1938 and 73–1939.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1974.

Decided July 2, 1974.

Rehearing En Banc Denied July 19, 1974.

Karla W. Simon and Richard D. Hobbet, Durham, N. C. (Hobbet & Simon, Durham, N. C., on brief), for appellant in No. 73–1938.

Norman B. Smith, Greensboro, N. C. (Smith, Carrington, Patterson, Follin & Curtis, Greensboro, N. C., on brief), for appellants in No. 73–1939.

William L. Osteen, U. S. Atty., for appellee in Nos. 73–1938 and 73–1939.

Before WINTER, CRAVEN and WIDENER, Circuit Judges.

CRAVEN, Circuit Judge:

In our view, these are cases of symbolic speech. In No. 73–1939 the defendants declined to participate in the traditional ceremony of rising upon entrance and departure of the presiding judge and were cited for contempt. In No. 73–1938 defendant engaged in hyperbole—claiming 3 billion dependents on a tax withholding form—and was charged with a violation of 26 U.S.C. § 7205. In the latter criminal tax case we hold the government failed to prove an essential element of the offense. In the contempt case we hold that refusal to rise is not "misbehavior [which] obstruct[s] the administration of justice" within the meaning of 18 U.S.C. § 401. In neither case do we find it necessary to decide whether the first amendment bars prosecution. Both convictions will be reversed with instructions to enter verdicts of acquittal.

Lyle and Sue Snider are Quakers. They moved to North Carolina in August 1971 after Lyle was employed as a teacher at Carolina Friends School in Chapel Hill. Their Quaker background [1] soon led them to join the Society of Friends Meeting in Durham.[2] They lived an ascetic life—residing in a farmhouse without running water and subsisting as vegetarians. According to their testimony and that of other members of the Durham Meeting, their concern for the consistency of their beliefs with their actions grew. They were particularly concerned with that portion of the Quaker Discipline [3] which opposed war in any form. The Discipline consisted of "Queries" and "Advices" which each Quaker was to read and consider individually. The Query on war asked:

> Do we endeavor to live in the virtue of that light and power that takes away the occasion of all wars, seeking to do our part in the work of reconciliation between individuals, groups, and nations? Do we faithfully maintain our testimony against military participation in war? Are we trying to build a world order to prevent war and to insure a just and durable peace?

The Advice on witnessing for peace [4] admonished:

> Take care in your relationship with others that you respect and cherish each man for men of all races and nationalities have a glow within their beings which unites all men as brothers. Take care also, therefore, to maintain a consistent witness for

1. Though neither is a "birthright" Quaker, both had significant contacts with that faith before coming to Chapel Hill. Sue had begun attending a Quaker Meeting during high school in California. Both attended Swarthmore College, an institution founded by the Society of Friends, and, shortly after they met each other, Lyle began attending the campus Meeting with Sue. After marriage and graduation, they taught at Quaker schools, first in New York and then in Pennsylvania. They did not "join" a Meeting, however, until moving to North Carolina.

2. As evidence of the high esteem in which he was held by fellow Quakers, Snider was elected Clerk of the local Meeting, the only office or position within a Quaker Meeting.

3. Discipline of the North Carolina Yearly Meeting of the Religious Society of Friends.

4. The theological basis for the Quaker "peace testimony" was explained by the noted Quaker theologian Rufus M. Jones in "The Quaker Peace Position," *The Survey*, XXXIV (1915), 22–23, quoted in II. Smith, R. Handy, and L. Loetscher, II *American Christianity* 397–401 (1963). *See also* William Penn, "Primitive Christianity Revived, in the Faith and Practice of the People Called Quakers," Chap. XI, para. 3 (1969), quoted in I *American Christianity* at 245–46.

peace, opposition to war, and to all acts of violence or coercion, that you may remain in accord with the time-less guidance of the Inner Light.

Believing that they could not follow the Advice nor answer the Query in the affirmative while voluntarily paying taxes, a large portion of which was used for military purposes, appellants decided that they could no longer *voluntarily* pay their taxes. The decision, they testified, was not made overnight. In college both had participated in protests aimed at ending the Vietnamese conflict. In March 1972 they sought a refund for their 1971 taxes on a theory of violation of their "freedom of religion." [5]

On May 30, 1972, Snider submitted to his employer an Employee's Withholding Allowance Certificate (Form W–4) which was dated a day earlier. On line 1, calling for "Total number of allowances you are claiming," Snider had written "3 billion." Together with the W–4 Form he enclosed a letter, addressed to "U. S. Government, Department of the Treasury, Internal Revenue Service" explaining his claim. It read:

Dear Friends,

We are claiming 3 billion exemptions on our W–4 form, because we are be-

coming more and more aware of our responsibility to our 3 billion fellow human beings all over the world. The military establishment of this country threatens the peace and security of every person on earth. Our country's military is destroying life on a horrifying scale in Southeast Asia, and it threatens to expand this destruction to other areas of the globe. Our responsibility to our fellow men leads us to resist this military establishment by refusing to pay *willingly* any of our tax money to it. We cannot continue to contribute money to the death and destruction which our military wreaks in Southeast Asia or to the fear which it generates in people the world over.

We also refuse to pay our taxes *willingly* to the U. S. Government on the ground that we are conscientiously opposed to any and all wars. We have a strong Christian faith which is the basis of our opposition to war and violence among men. We are conscientiously opposed to the use of violence to settle conflicts and we are committed to removing the causes of violent conflict. We cannot in good conscience support a government which devotes over 60 percent of its re-

5. The basis of the Sniders' claim for refund was explained in a letter attached to their 1971 income tax return (Government's Exhibit 3). It read:

Dear Friends,

As we file our income tax statement for 1971, we cannot help but be aware of the purpose to which our tax dollars are put. Approximately two-thirds of the money is spent for military purposes—debts due to past wars, costs of present war, and preparation for future war. Consequently, there is far too little money available to spend for housing, education, health care, and an unspoiled environment. Furthermore, it is the high military expenditures, rather than moneys budgeted for education, social security, etc., which are responsible for the 'cancer of inflation' which the government cannot seem to stop.

If the Administration were to set its priorities on programs for life, rather than death and destruction, there would be ample money for the real needs of people, and the President would not need to op-

pose an increase in Social Security benefits, for example, as 'inflationary.'

It is our conviction that, as Christians, we must follow the teachings and examples set by Jesus, and refuse to take part in killing. Furthermore, we cannot in good conscience let our money be used so that others might have weapons or be paid to kill. Men who are conscientiously opposed to war may legally perform alternative service to serving in the armed forces; not to permit this would be a violation of their religious freedom. Similarly, we hold that our freedom of religion is violated when our money is spent in war, for we are thereby forced to be unwilling participants in it.

Therefore, we claim a tax credit for the full amount of our taxes paid. The money refunded to us will be used in 'alternative service' to the military purposes for which the government would use it. It will thereby become an instrument of positive, reconciling action for peace instead of a weapon harmful to 'children and other living things.'

sources to war. We must work to change the priorities of that government and its people. As one of the most powerful military nations on earth, we must start leading the world toward peace.

We are not trying to avoid our responsibilities to the people of this country and the world by refusing to pay our taxes. We will pay our share of money and resources to life-affirming, positive programs such as medical care, welfare, psychological care and counseling, and education, to name a few. We are called by God to affirm life and love with our resources and to resist and eliminate war and violence among men.

'In peace and love,'

/s/ Lyle Snider and Susan Snider

(emphasis added). The letter and the W–4 Form were forwarded by the school's business manager to the District Director of the Internal Revenue Service, together with a letter from the business manager inquiring as to any action which the school should take in the matter. During the summer, while Snider was working with the American Friends' Service Committee in West Virginia, the school ignored the symbolic claim of 3 billion dependents and continued to withhold from Snider's paycheck on the basis of four dependents, the number listed on his previous W–4 Form. Upon his return at the end of the summer, there having been no reply to the school's inquiry to IRS, the school returned to Snider the sums that had previously been withheld. The school's faculty, in its capacity as a Quaker Meeting, shortly thereafter declared its support of Snider and its belief his position was one of conscience.

On December 15, 1972, after investigation by an IRS Special Agent confirmed that Snider was entitled to only four allowances (dependents) as previously claimed, Snider was arrested. Some two months later the grand jury returned an indictment against Snider, pursuant to 26 U.S.C. § 7205,[6] for willfully supplying his employer with "false and fraudulent" information.[7]

After a plea of not guilty, Snider was brought to trial on June 12, 1973. As court was convened, the clerk-crier's command that "All rise" went unheeded by a number of persons in the courtroom including the defendant and his wife. Despite the district judge's explanation of his understanding of the reasons for the rising requirement and the express request that Mr. and Mrs. Snider stand, each replied that he could not, in good conscience, do so.[7A] Snider

---

6. Section 7205 provides:
   Any individual required to supply information to his employer under section 3402 who willfully supplies false or fraudulent information, or who willfully fails to supply information thereunder which would require an increase in the tax to be withheld under section 3402, shall, in lieu of any other penalty provided by law (except the penalty provided by section 6682), upon conviction thereof, be fined not more than $500, or imprisoned not more than 1 year, or both.

7. The fact that the indictment read "false and fraudulent" while the statute recites "false or fraudulent," aside from indicating the ease with which "or" and "and" are interchanged as discussed *infra*, is of no mo-

ment. It is well settled that the language of the indictment may be conformed to the language of the statute under which it is brought so long as it details "the essential facts constituting the offense charged . . . ." Fed.R.Crim.P. 7(c). United States v. Martell, 335 F.2d 764 (4th Cir. 1964).

7A. Whether aware or not of the precedent, Mr. and Mrs. Snider's refusal to stand was the counterpart of what two early leaders of the Quaker faith had done when tried for preaching in the street and causing an unlawful and tumultuous assembly to disturb the King's peace. The defendants themselves, William Penn and William Mead, wrote an account of their trial at the Old Bailey in 1670 which is reported at 6 How-

was cited a total of 16 times [8] throughout the trial for contempt of court; his wife was cited only at the initial convening.

During the trial the motivation for Snider's having claimed 3 billion dependents became apparent—his religious belief that he could not *voluntarily* pay his taxes. The sincerity of his motivation was not seriously questioned at trial and we have no reason to doubt it. Equally clear, however, was the fact that Snider submitted the W–4 Form knowing that, according to the definition of "dependents" on the form, he was entitled to no more than four allowances. This act was admittedly deliberate, though,

according to Snider's testimony and that of his wife, he was unsure as to whether the act was protected by that portion of the first amendment which vouchsafes the free exercise of religion.

After seven communications to the judge, four returns for reinstruction (including a dynamite charge after deadlock), and approximately eight hours of deliberation over two days, the jury found Snider guilty. He was sentenced to eight months and, after summary contempt proceedings under Rule 42(a), given an additional 30 days for contempt. Sue Snider received a ten-day sentence, suspended for two years, for contempt.

ell's State Trials 951 (1661–1678). Two excerpts are particularly noteworthy:

The 3d of September, 1670, the court sat.

*Crier.* O Yes, &c.

*Clerk.* Bring William Penn and William Mead to the bar.

*Mayor.* Sirrah, who bid you put off their hats? put on their hats again.

*Obser.* Whereupon one of the officers putting the prisoners hats upon their heads (pursuant to the order of the court) brought them to the bar.

*Record.* Do you know where you are?

*Penn.* Yes.

*Record.* Do not you know it is the king's court.

*Penn.* I know it to be a court, and I suppose it to be the king's court.

*Record.* Do you not know there is respect due to the court?—*Penn.* Yes.

*Record.* Why do you not pay it then?

*Penn.* I do so.

*Record.* Why do you not pull off your hat then?

*Penn.* Because I not believe that to be any respect.

*Record.* Well, the court sets forty marks a piece upon your heads, as a fine for your contempt of the court.

*Penn.* I desire it might be observed, that we came into the court with our hats off (that is, taken off,) and if they have been put on since, it was by order from the bench; and therefore not we, but the bench should be fined.

*Mead.* I have a question to ask the Recorder: am I fined also?

*Record.* Yes.

*Mead.* I desire the Jury, and all people to take notice of this injustice of the recorder. Who spake to me to pull off my

hat? and yet hath he put a fine upon my head. O fear the Lord, and dread his power, and yield to the guidance of his holy spirit, for he is not far from every one of you.

6 Howell's State Trials at 956.

*Penn.* I demand my liberty, being freed by the Jury.

*Mayor.* No, you are in for your fines.

*Penn.* Fines, for what?

*Mayor.* For contempt of the Court.

*Penn.* I ask, if it be according to the fundamental laws of England, that any Englishman should be fined or amerced, but it expressly contradicts the 14th and 29th chapters of the Great Charter of England, which say, 'No freeman ought to be amerced but by the oath of good and lawful men of the vicinage.'

*Rec.* Take him away, take him away, take him out of the Court.

*Penn.* I can never urge the fundamental laws of England, but you cry, Take him away, take him away. But it is no wonder, since the Spanish Inquisition hath so great a place in the Recorder's heart. God Almighty, who is just, will judge you all for these things.

*Observ.* They hauled the prisoners into the Bale-dock, and from thence sent them to Newgate, for non-payment of their fines and so were their Jury. But the Jury were afterwards discharged upon an Habeas Corpus, returnable in the Common-Pleas, where their commitment was adjudged illegal.

6 Howell's State Trials 969.

8. Snider was refused permission to avoid further citations by entering after court was convened and exiting prior to its recess or adjournment.

## I.

In the tax case appellant Snider contests his conviction under section 7205 on six grounds: (1) that the statute, as applied to him, is unconstitutional as an infringement of his right to the free exercise of religion; (2) that it was error for the district judge not to grant his motion for judgment of acquittal at the conclusion of the government's case on the ground that the government had failed to prove two essential elements of the crime charged, *viz.*, that Snider had supplied "false or fraudulent" information and that he had acted "willfully;" (3) that the trial judge erroneously charged the jury as to the meaning of "false" and "willfully" in section 7205 so as to entitle Snider to a new trial; (4) that the failure to resubmit the entire charge to the jury upon the jury's request for reinstruction on the meaning of "false or fraudulent" was an abuse of discretion and amounted to prejudicial error because the portion of the instruction which was reiterated was favorable to the government; (5) that the *Allen* [Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)] charge given to the jury after it reached a deadlock was coercive; and (6) that the imposition of an active prison sentence, while within the statutory maximum, was arbitrary and constituted an abuse of discretion. Because we find the appellant's second and third contentions to be meritorious we do not reach the other points of error.[8A] We turn, then, to a consideration of the meaning of "false or fraudulent" and "willfully" in section 7205 of the Internal Revenue Code.

### A. "False or Fraudulent"

The district judge's view of the meaning of "false" and "fraudulent" in 26 U.S.C. § 7205 is reflected in his charge to the jury. "A statement, including a statement in a claim or document, is 'false,'" he instructed, "if it were untrue when made, and was then known to be untrue by the person making it, or causing it to be made. A statement or claim or document is 'fraudulent' if it was falsely made, or caused to be made, with the intent to deceive." In so charging, the district judge rejected defendant's interpretation of "false" as meaning more than untrue in the sense that the statement must be made "with an intent to deceive or mislead," an interpretation offered by defendant both on argument for his motion for judgment of acquittal and through his proposed jury instructions.[9] Despite the fact that the language of the statute is

8A. Appellant's claim of unconstitutionality on free exercise grounds is supported by American Friends Service Committee v. United States, 368 F.Supp. 1176 (E.D.Pa. Dec. 31, 1973). The argument, challenging not the *power* to tax, an issue foreclosed by Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1942), but the *method* of taxing, rests upon the so-called "principle of alternative burdens." Clark, Guidelines for the Free Exercise Clause, 83 Harv.L. Rev. 327, 348–352 (1969). *See* Braunfeld v. Brown, 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Sherbert v. Verner, 374 U.S. 398, 407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1961). *Cf.* Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See also,* Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development: Part I. The Religious Liberty Guarantee, 80 Harv.L.Rev. 1381 (1967); Dodge, The Free Exercise Clause: A Sociological Approach, 67 Mich.L.Rev. 679, 718–19 (1969). However interesting the question, we must follow the rules expressed by Justice Brandeis in Ashwander v. TVA, 297 U. S. 288, 346–348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (concurring):

2. The Court will not "anticipate a question of constitutional law in advance of the necessity of deciding it." Liverpool, N. Y. & P. S. S. Co. v. Emigration Comrs., 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 . . . .

. . . . .

7. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." Crowell v. Benson, 285 U.S. 22, 62, 52 S. Ct. 285, 296, 76 L.Ed. 598 . . . .

9. Appellant proposed the following instruction on the meaning of "false" in § 7205:

False, when used in a criminal statute, does not mean simply incorrect or untrue.

written in the disjunctive, the appellant urges that the words "false or fraudulent" should be read "false and fraudulent" or, to the same purpose, that "false" be given the restrictive definition set out in his proposed jury instruction in order to save the words "or fraudulent" from being surplusage.

**1.**

■ It is a familiar rule of statutory construction that Congress is presumed to have used words according to their ordinary meaning, unless a different signification is clearly indicated. Avery v. C. I. R., 292 U.S. 210, 214, 54 S.Ct. 674, 78 L.Ed. 1216 (1934). Though the first dictionary meaning of "false" corresponds with the district judge's charge,[10] it is important to note that the word, as judicially construed, means much more in other statutes. For example, "false" in section 14(c)(2) of the Bankruptcy Act, 11 U.S.C. § 32(c)(2), which creates an objection to the discharge of a bankrupt where he makes a "materially false statement in writing respecting his financial condition," has been interpreted to mean "more than er-

roneous or untrue" and to "[import] an intention to deceive." 1A Collier on Bankruptcy § 14.40 (14th ed.). *See* Third Nat'l Bank v. Schatten, 81 F.2d 538 (6th Cir. 1936); In re Rosenfeld, 262 F. 876 (2d Cir. 1919); Doyle v. First Nat'l Bank of Baltimore, 231 F. 649 (4th Cir. 1916). And the use of "falsely" in section 346(a) of the Nationality Act of 1940, 8 U.S.C. § 746 (now incorporated into Chapter 18 at sections 911 and 1015), to make criminal the act of knowingly and falsely representing oneself to be a citizen of the United States was interpreted as follows: "In law this word *usually* means something more than untrue; it [false] means something designedly untrue and deceitful and implies an intention to perpetrate some treachery or fraud." United States v. Martinez, 73 F.Supp. 403, 407 (M.D.Pa.1947) (emphasis added). Even 18 U.S.C. § 1001, prohibiting the making or using of "any false, fictitious or fraudulent statements" within the province of any government "department or agency," utilizes "false" in a context that signifies more than mere untruth. Seizing upon the reference to a "material fact" in the first part of the statute,[11]

It means deceptive; assumed or designed to deceive; a statement made with an intent to deceive or mislead. When it is used in connection with the word fraudulent in a criminal statute, the requirement of deceptiveness is made even stronger by linking false with fraudulent.

False in such a context cannot be construed in its ordinary vernacular sense. You must find that the information supplied by Defendant in his W–4 Form was not only incorrect but was also deceptive; or that it deceived the employer and the Treasury into believing the information; or that it was intended to deceive or mislead the employer and the Treasury. If you do not find beyond a reasonable doubt that the information on the Defendant's W–4 Form was intended to or did deceive or mislead his employer or the Treasury, you must return a verdict of not guilty on the indictment.

The court's instruction was resubmitted to the jury, once orally and once in writing, due to the jury's obvious difficulty with the meaning of the words "false" and "fraudulent."

10. The first definition given by Webster's Third New International Dictionary is "not corresponding to truth or reality: not true," and "intentionally untrue." The second definition, however, includes the phrase "tending to deceive." It is also interesting to note that the word is derived from the Latin "fallere," meaning "to deceive."

"False," like "income" in Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L..Ed. 372 (1918), gives rise to Justice Holmes' admonition that:

A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

11. 18 U.S.C. § 1001 reads, in its entirety, as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes

courts have developed "materiality" as an element of the offense. The test for materiality under this statute was explained in Weinstock v. United States, 97 U.S.App.D.C. 365, 231 F.2d 699, 701–702 (1956), as "whether the false statement has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a determination required to be made." In other words, though the false statement need deceive no one in actuality, Robles v. United States, 279 F.2d 401, 404 (9th Cir. 1960), cert. denied, 365 U.S. 836, 81 S.Ct. 750, 5 L.Ed.2d 745 (1961); United States v. Coastal Contracting and Engineering Co., 174 F.Supp. 474 (D.Md. 1959), it must be deceptive, "calculated to induce agency reliance or action," United States v. Quirk, 167 F.Supp. 462, 464 (E.D.Pa.1958), aff'd, 266 F.2d 26 (3d Cir. 1959).[12] The gloss put upon "false" in various contexts throughout the United States Code, if not sufficient to demonstrate that the ordinary meaning of the word in a statutory context is more than untrue and implies an intention to deceive or mislead,[13] is at least sufficient to point up the ambiguity of the term. We must accordingly utilize several familiar methods of statutory construction to arrive at the meaning of the phrase "false or fraudulent" in section 7205.

## 2.

We begin with the premise that all parts of the statute must be read together, neither taking specific words out of context, United States v. American Trucking Ass'n, Inc., 310 U.S. 534, 542–543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), nor interpreting one part so as to render another meaningless, Helvering v. Morgan's, Inc., 293 U.S. 121, 55 S.Ct. 60, 79 L.Ed. 232 (1934). Were we to accept the government's position, as did the district judge, that "false" means "untrue" and "fraudulent" means "falsely made . . .

---

or uses any false writing or document knowing the same to contain any · false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

12. *Compare* the result achieved by the materiality standard in 18 U.S.C. § 1001 *with* the False Claims Act, 31 U.S.C. § 231, which prohibits "obtaining . . . the payment . . . of any false or fraudulent claim . . . with intent to defraud the United States." "False," as used in the False Claims Act, unquestionably means more than "untrue," despite the use of the disjunctive "false or fraudulent," because of the addition of the phrase "with intent to defraud." *See also* 18 U.S.C. § 287, prescribing a felony for making or presenting "to any person or officer in the civil, military, or naval service of the United States, . . . any claim upon or against the United States, . . . knowing such claim to be false, fictitious, or fraudulent." Unlike 18 U.S.C. § 1001, this provision makes no reference to "material fact." Nevertheless, "materiality" has been required as an element of the offense in the same manner as under section 1001. "The very purpose of sections 287 and 1001 is to protect the government against those who would cheat or mislead it in the administration of its programs."

United States v. Johnson, 284 F.Supp. 273, 278 (W.D.Mo.1968), aff'd, 410 F.2d 38 (8th Cir.), cert. denied, 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). Implicit within the utilization of the materiality standard under 287 and 1001 is the notion that the criminal intent necessary under the statute includes not only an intention to make the statement but also an intention to deceive or mislead the person or agency to whom it is proffered.

13. Two widely used texts support this conclusion. At 35 C.J.S. p. 614 it is said:

In the more important uses [of "false"] in jurisprudence, and even in its popular application, the word implies something more than a mere untruth, that is an untruth coupled with a lying intent; and this is described as the primary meaning of the word, importing moral delinquency, or somewhat more than the vernacular sense of erroneous or untrue; and implying an evil, or a guilty intent, an intent to deceive, or an intention to perpetuate some treachery or fraud, including not only the element of error, but also that of intentional wrong.

And 1 Bouvier's Law Dictionary 1181 (3d ed. 1914) states: "Applied to the intentional act of a responsible being, it [false] implies a purpose to deceive."

with the intent to deceive," then the phrase "or fraudulent" in 26 U.S.C. § 7205 is rendered a nullity. That which is "fraudulent" within the district judge's instructions to the jury is also, by definition, "false;" thus the government need only prove that Snider's claim was untrue and is relieved of any obligation to show that the statement is deceptive or that it was made with an intention to deceive. Such an interpretation not only renders "or fraudulent" superfluous, it may give the statute "unintended breadth" [14] so as to make criminal an act which the Congress did not consider punishable.

On the other hand, adoption of appellant's view would result in giving virtually the same meaning to both words, an interpretation which should also be avoided if possible. Jarecki v. G. D. Searle & Co., 367 U.S. 303, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). But, given the meaning attached to "false" in similar statutes discussed above, it is not unlikely that Congress' choice of words was indicative either of a cumulative effect, in which each of several words is used to convey a similar meaning, as in the "false, fictitious or fraudulent" language of 18 U.S.C. §§ 287 and 1001, or of a conjunctive connotation,[15] similar to the meaning of "false and fraudulent" as used in the Food and Drug Act of 1906,[16] and the interpretation given to the use of "false or fraudulent" as used at three places within the Corporation Tax Law of 1909, 36 Stat. 112.[17]

3.

That no particular care was given to the choice of the disjunctive form is

further substantiated by the legislative history of the Current Tax Payment Act of 1943, which adopted the pay-as-you-go (withholding) method of collecting income tax. Section 470(d) of the Act was incorporated into the 1939 Internal Revenue Code as section 1626(d) and became, without material change, section 7205 of the 1954 Code. The Senate Report on the bill contained the following discussion of section 470(d):

> Section 470(d) was a new provision added to the code by the House bill. This section provides appropriate penalties applicable to employees who willfully supply *false or fraudulent* withholding exemption certificates or who willfully fail to supply information which would decrease the withholding exemption. The penalty in each instance is a fine of not more than $500 or imprisonment of not more than 1 year, or both, and such penalties are in lieu of those provided, in section 145(a) of the code. This provision with minor modifications is retained in your committee bill as section 1626(d). As amended the statutory language makes clear that the penalties are applicable in the case of an employee who willfully supplies *false and fraudulent* information, or who willfully fails to supply information, which would require an increase in the tax to be withheld at source on his wages.

S.Rep.No. 221, 78th Cong., 1st Sess. 30–31 (1943) (emphasis added). This interchangeable use of "or" and "and," when considered in light of the interpretation given to "false or fraudulent" in prior revenue statutes, is in-

---

14. The maxim noscitur a soius, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.
Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

15. This latter approach, reading "or" to mean "and" is certainly not unknown. *See,* e. g., United States v. Fisk, 70 U.S. 445, 3

Wall. 445, 18 L.Ed. 243 (1866); De Sylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); United States v. Moore, 104 F. 78 (D.Ky.1900). In *Ballentine* the Supreme Court stated: "We start with the proposition that the word 'or' . . . is often used in phrases where 'and' would express the thought with greater clarity." 351 U.S. at 573, 76 S.Ct. at 976.

16. *See* United States v. Roberts Veterinary Co., 104 F.2d 785 (7th Cir. 1939).

17. *See* discussion at p. 654, *infra.*

structive. The first employment of the phrase appears to have been in the Corporation Tax Law of 1909, 36 Stat. 112, which provided for the collection of a corporate excise tax. The fifth paragraph of section 38 of the Act provided for the assessment of additional tax within three years after the tax was due but not paid due to the filing of "false or fraudulent returns." The phrase was also employed at three other places within the Act—once to describe the intent necessary for the Commissioner to add on a 100 percent penalty ("false or fraudulent intent") and twice to describe an act punishable as a misdemeanor ("make a false or fraudulent return"). The First Circuit, in a case brought under section 38, para. 5 of the Act, framed the issue as

> whether "false or fraudulent," in that clause of the fifth subdivision which authorizes the assessment of additional taxes upon discovery within three years after the original return, is to be taken as meaning only such returns as are fraudulently false, or as including also such returns as are false only in the sense of being incorrect.

Eliot Nat'l Bank v. Gill, 218 F. 600, 603 (1914). Noting that the use of the phrase in each of the other three contexts denoted a penalty, either civil or criminal, and that, in such a context, "may be taken . . . to mean 'false and fraudulent,'" the court agreed that in this context, where no penalty was imposed and no offense created, "false" should properly be interpreted as "incorrect." *Accord*, National Bank of Commerce v. Allen, 223 F. 472 (8th Cir.), cert. denied, 239 U.S. 642, 36 S.Ct. 163, 60 L.Ed. 482 (1915). Here, like the three other uses of the phrase in *Gill*, the purpose is not restitutionary—allowing the Commissioner to recoup taxes owed but not paid—but rather penal.

After the reinstitution of the personal income tax in 1913 the phrase found its way into the revenue statutes. *See* section 278(a) of the Revenue Act of 1918; section 276(a) of the Revenue Act of 1936; section 276(a) of the Internal Revenue Code of 1939. Each usage was limited, however, to a determination of when the statute of limitations was tolled so as to permit the Commissioner to assess for taxes owed but not paid or to impose a penalty of civil fraud. None was concerned with defining a criminal sanction. Subsequent acts have continued to incorporate a similar provision, the effect of which is to toll the statute of limitations where a "false or fraudulent return with the intent to evade tax," 26 U.S.C. § 6501(c)(1), is submitted. Such use of the phrase has been interpreted to require a clear showing of fraud—the fact that the return was false, in the sense of incorrect, being insufficient. Mitchell v. C.I.R., 118 F.2d 308, 310 (5th Cir. 1941); Davis v. C.I. R., 184 F.2d 86 (10th Cir. 1950). In *Davis* the court stated: "[A] failure to file a correct return does not necessarily constitute fraud. Fraud implies bad faith, intentional wrong doing *and a sinister motive*." 184 F.2d at 87 (emphasis added). If such is the content of the "false or fraudulent return" necessary to show *civil* tax fraud, we think no less should be required under the criminal sanction of section 7205, even though section 6501(c)(1) contains the additional phrase "with the intent to evade tax." [18] Surely Congress could not have intended to require a showing of fraud, Carter v. Campbell, 264 F.2d 930 (5th Cir. 1959), merely to toll a statute of limitations for supplying "false or fraudulent returns" and yet impose a criminal sanction for the supplying of a withholding certificate that is false only in the sense of being "incorrect." Nev-

---

18. Section 7205, as noted above, is the direct descendant of section 470(d) of the Current Tax Payment Act of 1943 (section 1626(d) of the 1939 Code, as amended). Since the 1939 Code punished as a misdemeanor only the failure to supply information, not the supplying of "false or fraudulent" information [section 145(a)], the only antecedent of section 470(d) was the misdemeanor provision of the Corporation Tax Act of 1909, interpreted in *Gill* to mean "false and fraudulent."

ertheless, the government urges upon us a position in which a violation of § 7205 would require proof only that Snider submitted incorrect information.[19] We cannot agree. The use of the phrase "false or fraudulent" throughout the history of the revenue acts as well as in other statutes belies such an interpretation. So does the existence of adequate civil sanctions which prevent widespread abuse of the withholding system through protests of the type attempted by Snider.[20] But neither should we adopt the position advocated by the appellant. Though an examination of the legislative history of section 7205 together with a consideration of the past usage of similar phrases in other statutes indicates that "or" may be read "and," we decline to go so far. To do so would, we believe, render difficult, if not impossible, the distinction between felony and misdemeanor which the 1954 recodification of the criminal sanctions was designed to implement.[21] Instead, we hold that in order for a taxpayer to be convicted of supplying "false or fraudulent" information contrary to section 7205 the information must either be (1) supplied with an intent to deceive, or (2) false in the sense of deceptive—of such a nature that it could reasonably affect withholding to the detriment of the government. This interpretation gives meaning to both words and avoids the judicial rewriting of "or" as "and." Furthermore, it maintains the integrity of 26 U.S.C. §§ 7201–7207 by differentiating the sec-

tion 7205 misdemeanor from the two felony provisions in much the same way as we believe the Supreme Court in United States v. Bishop, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), indicated the section 7207 misdemeanor should be distinguished from sections 7201 and 7206: by "the additional misconduct essential to a violation of the felony statutes." 412 U.S. at 358–359, 92 S.Ct. at 2016, quoting United States v. Vitiello, 363 F.2d 240, 243 (3d Cir. 1966). Finally, such an interpretation is consistent with the rule that "[t]axing statutes must be applied within reasonable limits and construed in the light of their purpose." Musselman Hub-Brake Co. v. C.I.R., 139 F.2d 65, 67 (6th Cir. 1943). We find nothing in the legislative history which might indicate that a less restrictive definition of "false or fraudulent" should apply,[22] whereas we believe it reasonable and consistent with past interpretations that "false" means more than merely "untrue" or "incorrect."

### 4.

We think United States v. Malinowski, 347 F.Supp. 347, 351–353 (E.D.Pa.1972), aff'd 472 F.2d 850 (3d Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973), is not necessarily to the contrary. In *Malinowski* the defendant filed a Form W–4 claiming 15 exemptions and with it sent a letter to his employer advising that he had "entered into a relationship of economic and social dependency with a group of 15 per-

19. The United States Attorney admitted on oral argument that the case was tried on the theory that the statement was "false," meaning merely "untrue" or "incorrect."

20. See, e. g., the civil collection remedies available in 26 U.S.C. §§ 6601–6689 and Reg. § 31.3401(e)–1, permitting the IRS to treat the claim of three billion dependents as no information and to withhold on the basis of no exemptions. Had the IRS bureaucracy simply responded to the school's inquiry with instructions to continue to withhold from Snider's wages on the basis of four dependents (or none) that would have ended the matter and have avoided what seems to us an improvident and wholly unnecessary criminal prosecution.

21. In United States v. Bishop, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), the Court distinguished the felony codified as 7201 from the misdemeanor codified as 7203 on the ground that the former requires commission of an act while the latter punishes only an omission. 412 U.S. at 359, 93 S.Ct. 2008. Similarly, as we construe § 7205, there is no need for the government to prove in a prosecution for misdemeanor under that section effective deception as would be necessary for prosecution of the felony under § 7201.

22. See H.R.Rep.No. 401, 78th Cong., 1st Sess. 1–4 (1943); S.Rep.No. 221, 78th Cong. 1st Sess. 1–2 (1943).

sons . . . ." 472 F.2d at 852. Although Malinowski stated that one of his aims was to exercise greater control over the use of taxes and especially that large portion used for war-making, both the district court, 347 F.Supp. at 352, and the court of appeals, 472 F.2d at 856, refused to consider what was characterized as his motivation and held it to be irrelevant. As we read the opinion of Judge Aldisert, Malinowski's contention on appeal was that the information was not supplied "willfully." There was no discussion at the appellate level of the meaning of "false;" the issue apparently was not raised. The district court's treatment of the question, hinging on its belief that a stricter interpretation of "false" would reduce the withholding system "to a shambles," 347 F. Supp. at 352, is inadequate. This is especially true in light of the power of the IRS to treat a claim such as Snider's as constituting no information and withhold on the basis of zero dependents. I. R.S. Reg. § 31.3401(e)-1.[23] Under the test which we adopt today it is entirely possible that a jury might find a claim of 15 exemptions to be deceptive and capable of misleading employer and IRS alike as to the amount properly to be withheld. A similar possibility exists under the facts of United States v. Smith, 487 F.2d 329 (9th Cir. 1973), where defendants claimed 10, 10, and 17 exemptions respectively. A claim of "3 billion," on the other hand, could deceive no one. It is purely symbolic, the attached letter aside. To this extent both *Malinowski* and *Smith* are distinguisha-

ble; to the extent that they are not distinguishable, we decline to follow them.

### 5.

The interpretation of "false or fraudulent" by the district court constitutes an error of law which is reflected not only in the jury instructions on the meaning of "false" but also in the denial of defendant's motion, styled a "motion to dismiss," made at the conclusion of the government's case. Treating the motion as one for judgment of acquittal under Fed.R.Crim.P. 29, we reverse the district judge's denial of the motion and enter judgment of acquittal. Whether Rule 29 confines our power of disposition to either grant or refuse the motion or includes the power to remand for a new trial,[24] this is not a case in which "the defect in the evidence might be supplied on another trial." Bryan v. United States, 338 U.S. 552, 559, 70 S. Ct. 317, 321, 94 L.Ed. 335 (1950). Additional facts could not enable a jury to conclude that the entry of "3 billion" on defendant's W–4 Form was "false or fraudulent" as we have construed the term. Since the evidence as to "false or fraudulent" is insufficient and cannot be cured at a second trial, dismissal of the indictment, rather than a new trial, is appropriate. United States v. Edmons, 432 F.2d 577, 586 (2d Cir. 1970); Murray v. United States, 403 F.2d 694, 696 (9th Cir. 1968); Phillips v. United States, 311 F.2d 204, 207 (10th Cir. 1962). *See generally* Griffin v. United States, 269 F.2d 903 (4th Cir. 1959).

23. Section 31.3401(e)–1(a) provides: '
   The term "number of withholding exemptions claimed" means the number of withholding exemptions claimed in a withholding exemption certificate under section 3402(f) or in effect under section 1622(h) of the Internal Revenue Code of 1939. *If no such certificate is in effect, the number of withholding exemptions claimed shall be considered to be zero.*
   (Emphasis added).

24. *Compare* Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950), *with* Sapir v. United States, 348 U.S. 373, 374, 75

S.Ct. 422, 99 L.Ed. 426 (1955) (Douglas, J., concurring) *and* Forman v. United States, 361 U.S. 416 (1960). *See* United States v. Musquiz, 445 F.2d .963 (5th Cir. 1971), where Judge Thornberry suggested that an appellate court is without power to order a new trial in the absence of defendant's motion for such in the lower court. 445 F.2d at 963. *Accord*, C. Wright and A. Miller, 2 Federal Practice and Procedure: Criminal § 470, at 272 (1969). We need not decide whether this view of *Forman* and *Sapir* is correct in view of the fact that we deem dismissal of the indictment rather than retrial to be the proper course in this instance.

## B. "Willfully"

On appeal, Snider also urges, alternatively, that he is entitled (1) to judgment of acquittal on the basis of the government's failure to prove that he acted "willfully" or (2) to a new trial because of an erroneous jury instruction on the issue of willfulness. He contends that his belief that he had a first amendment right to symbolically claim three billion dependents in protest of the Vietnam War and war in general could be found by a jury to negate the element of willfulness.[25] In United States v. Bishop, 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), the Supreme Court settled the question of whether the word willfully has the same meaning in the felony statutes, 26 U.S.C. §§ 7201, 7206, as it does in the misdemeanor statutes, 26 U.S.C. §§ 7202–7205, 7207. It does. The Court also made it clear that it had consistently interpreted the word "willfully" to require an element of *mens rea* and that "[u]ntil Congress speaks otherwise, we therefore shall continue to require, in both tax felonies and tax misdemeanors that must be done 'willfully,' the bad purpose or evil motive described in [United States v.] *Murdock* [290 U.S. 389, 398, 54 S.Ct. 223, 78 L.Ed. 381 (1933)] . . . ." 412 U.S. at 361, 93 S.Ct. at 2017. Thus it is no longer clear, as we would have previously thought, that the element of willfulness in a tax statute is established by proof of a voluntary, intentional violation of a known legal duty—without more. It is possible that purpose and motivation may be found by a jury to negate willfulness. *But see* United States v. Malinowski, 472 F.2d 850 (3d Cir.), cert. denied, 411 U.S. 970, 93 S.Ct. 2164, 36 L. Ed.2d 693 (1973), and United States v. Moylan, 417 F.2d 1002 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970).

Because disposition of the appeal is sufficiently governed by our holding in section A with respect to the interpretation of "false or fraudulent," we need not presently decide this question.

## II.

Both Lyle and Sue Snider appeal from their summary contempt convictions under Fed.R.Crim.P. 42(a). They urge that (1) their conduct, even if contemptuous, did not merit summary disposition under Rule 42(a), (2) the failure to rise was not contempt within the meaning of 18 U.S.C. § 401, and (3) even if within the meaning of the statute, their failure to rise was protected by the first amendment.

### A. Summary Contempt

Assuming for the moment that appellants' behavior amounted to contempt, the language of Rule 42(a)—"that he saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court"—would seem to support the district judge's actions in dealing summarily with appellants. But Rule 42(a) has been interpreted more narrowly by the Supreme Court. It has thus been said that the rule was "reserved 'for exceptional circumstances,' Brown v. United States, 359 U.S. 41, 54, [79 S.Ct. 539, 548, 3 L.Ed.2d 609] (dissenting opinion) . . . [where] speedy punishment may be necessary in order to achieve 'summary vindication of the court's dignity and authority' Cooke v. United States, 267 U.S. 517, [534, 45 S.Ct. 390, 394, 69 L.Ed. 767] . . . ." Harris v. United States, 382 U.S. 162, 164, 86 S.Ct. 352, 354, 15 L.Ed.2d 240 (1965). Harris' assertion of a fifth amendment privilege not to testify before a grand jury, like the Sniders' claim of a first amendment privilege not to stand, was not "such an open, serious threat to orderly procedure" nor such an "unusual situation" that "instant action [was] necessary to protect the judicial institution itself." 382 U.S. at 167, 86 S.Ct. at 356. The length of time between the initial contemptuous behavior by Snider

---

25. *See* A. J. Muste, 35 T.C. 913 (1961).

(the only such behavior by his wife) and the summary punishment (two days) together with the questionable disruptiveness of the behavior itself indicate that appellants were entitled to the full notice and hearing provided by Fed.R.Crim.P. 42(b). Groppi v. Leslie, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972); *cf.* Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952).

### B. "Contempt" within the Statute

The federal contempt statute, 18 U.S. C. § 401, provides

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—(1) *Misbehavior* of any person in its presence or so near thereto as to *obstruct the administration of justice*;
. . .

(emphasis added). This statute rests on the unquestioned premise that courts must be free to conduct their business without interruption, interference or obstruction. Wood v. Georgia, 370 U.S. 375, 383, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). The contempt power which it grants is inherent in all courts of general jurisdiction, state as well as federal,[25a] United States v. Shipp, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906), but the fact that the authority of federal courts to punish contempt has been codified is recognition of the fact that such a power, unrestrained by judicial discretion, can encroach upon the very rights and privileges which the courts are designed to foster. For that reason the language of the statute defining the authority to use such power must be closely considered and the judges who are given that authority are admonished to be "men of fortitude, able to thrive in a hardy climate," Craig v. Harney, 331

U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L. Ed. 1546 (1947), and continually "on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." Brown v. United States, 356 U.S. 148, 153, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958).

The record in this case shows no attempt on the part of appellants to make Snider's trial a forum or a circus for the expression of their own political or religious beliefs. Never was their conduct anything but quiet and respectful. Neither by word nor sign did they do anything "to obstruct the administration of justice"—except they would not stand. When ordered to do so, their response was a simple "I cannot, in good conscience, stand" or words of similar content. Nothing in the record reveals that these words were spoken maliciously, antagonistically, belligerently or were, in the slightest degree, disrespectful in tone or decibel volume or by reason of gesture or demeanor. This case thus presents the bald question whether a failure to stand (accompanied only by such interruption of proceedings as are thought necessary by the district judge to explain the consequences of contempt and cite the alleged contemnor for his actions) is "misbehavior" within the meaning of 18 U.S.C. § 401.

We are inclined to think it is not, but at least one circuit has reached a conclusion directly to the contrary.[26] In United States ex rel. Robson v. Malone, 412 F.2d 848 (1969), the Seventh Circuit, in the context of a refusal to stand, expressed some doubt that a district judge was empowered to require spectators to perform "purely ceremonial or symbolic acts," citing West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1942). 412 F.2d at 850. Yet the court over-

---

25a. *But see* Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941).

26. We put to one side Comstock v. United States, 419 F.2d 1128 (9th Cir. 1969), because the defendant in that case not only refused to rise but when the marshal took him by the arm to lead him to the bench he went limp and prostrated himself on the floor. 419 F.2d at 1131. Unquestionably such unconventional behavior and the resultant necessity to remove him from the courtroom constituted misbehavior obstructing the administration of justice.

came its doubt and held in a per curiam opinion, without citation of authority, that a district court may require such rising and that, if "the requirement is proper, it follows that it can be enforced."[27] 412 F.2d at 850.

Subsequently, in United States v. Seale, 461 F.2d 345, 371 (7th Cir. 1972), the Seventh Circuit recognized that its own prior decisions required "an actual material obstruction" and in a companion case, In re Dellinger, 461 F.2d 389, 401 (7th Cir. 1972), conceded that a symbolic act such as refusal to stand, "when not coupled with further disturbance or disruption, sometimes might not rise to the level of an actual and material obstruction of the judicial process."

Finally, in In re Chase, 468 F.2d 128 (7th Cir. 1972), the Seventh Circuit found that a refusal to stand coupled with what the court deemed to be necessary interruption of the trial by reason of the time consumed in citing the defendant for contempt constituted misbehavior obstructing the administration of justice. 468 F.2d at 132. The court declined, however, to create a per se rule that failure to stand was itself contempt, although the government argued that without such a rule "the determination of the offense would not rest on the wrongful character of the conduct, but upon the resulting reaction of the judge." 468 F.2d at 133. Under *Chase*, the same conduct in one court would be contempt while in another it would not, depending upon the judge. We find it difficult to accept such a subjective interpretation of "misbehavior." Either it is or it is not contemptuous, and such a judgment should rest not on the judge's sensibility but upon the purposes served by the requirement.

That the custom of rising contributes to the functioning of the court by "marking the beginning and end of the session" and by "serv[ing] to remind all that attention must be concentrated upon the business before the court," United States ex rel. Robson v. Malone, 412 F.2d 848, 850 (7th Cir. 1969), we do not question. But the words of the clerk or the judge may serve this function as well. The rising requirement seems to us not essential to the functioning of the court; as such, the failure to rise does not constitute a material obstruction. If the failure to rise distracts others, provokes a reaction on their part or even causes "a failure to become silent or focus attention on the business before the court," 468 F.2d at 133, we think the fault may better be resolved by compelling silence and attention than by coercing a gesture of respect. What others do may constitute misbehavior on their part, but it does not justify the finding of criminal contempt as to the person who simply refuses to stand and does nothing more. Of course, improper language or gestures accompanying such a refusal may be separately punishable as contempt.

We share the doubt expressed by the Ninth Circuit in Comstock v. United States, 419 F.2d 1128 (1969), that failure to rise per se, whether stemming from religious belief, conscience or symbolic protest, can be punished as "misbehavior" within the meaning of 18 U.S.C. § 401 without violating the Constitution. Where behavior in the courtroom reaches the level of speech or expression, it is protected, absent "an imminent . . . threat to the administration of justice." In re Little, 404 U.S. 553, 555, 92 S.Ct. 659, 660, 30 L.Ed.2d 708 (1972);[28] *see* In re McConnell, 370 U.S.

27. What the court thought of a contempt citation for refusal to stand is revealed more by what it did than what it said: the 30-day sentence was reduced to 4 hours actually served.

28. Little, the defendant in a criminal trial, represented himself, and following the close of the evidence he stated "that the court

was biased and had prejudged the case and that petitioner was a political prisoner." 404 U.S. at 554, 92 S.Ct. at 660. In concluding that this behavior did not constitute grounds for criminal contempt, the Supreme Court applied the "clear and present danger" rationale of earlier cases involving contempt convictions for publications and other forms of speech made outside the presence

230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962). If Snider's refusal to rise constitutes symbolic speech,[29] and if we should construe the statute so as to embrace that refusal to rise within the meaning of "misbehavior," a very serious constitutional question would be presented—not unlike that in West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1942). It is not easy to distinguish the rising requirement from the flag salute. Both seem to require affirmation, if not of a belief, at least of "an attitude of mind."[30] 319 U.S. at 633, 63 S.Ct. 1178. As Mr. Justice Jackson said in *Barnette,*

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word ·or *act* their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

319 U.S. at 642, 63 S.Ct. at 1187 (emphasis added)..

■ We are thus led to the conclusion, and so hold, that the mere failure to rise upon command of the marshal in a United States courtroom is not misbehavior within the meaning of 18 U.S.C. § 401 and does not constitute criminal contempt of the court. To so hold will not, we think, tend to diminish respect for the judiciary and for the administration of justice. We do not envision, as the result of our decision today, disorder flourishing in the courtroom. Instead, we anticipate the custom of rising upon the convening and adjournment of court will continue and become more significant because wholly voluntary. There was a time when an unwary parishioner was tapped by the warden to enforce traditional religious observance, including rising, the bowing of knee and head. The gestures of piety are still observed —but without coercion.

We have no doubt that the judges of this circuit will continue to maintain order in the courtroom and to conduct business expeditiously. We think they fully share our belief that "real respect of the citizenry for the judiciary is earned, not commanded." In re Chase, 468 F.2d 128, 137 (7th Cir. 1972) (Stevens, J., dissenting).

Reversed.

WIDENER, Circuit Judge (dissenting):

I must respectfully dissent.

In its arrival at the discharge of the defendants in this case, the majority flies in the face of precedent, undermines statutory law required for the administration of a voluntary tax system,

---

of the court. *See* Bridges v. California, 314 U.S. 252, 262–263, 62 S.Ct. 190, 86 L.Ed. 192 (1941); Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 91 L.Ed. 1546 (1946); Wood v. Georgia, 370 U.S. 375, 384–385, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). The phrasing was from *Craig:*

"The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil . . . ." Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947).

404 U.S. at 555, 92 S.Ct. at 660.

**29.** *See, e. g.,* Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed. 2d 572 (1969); Frain v. Baron, 307 F.Supp. 27 (E.D.N.Y.1969). .

**30.** Justice Jackson added:

The State announces rank, function, and authority through crowns and maces, uniforms and black robes, the church speaks through the Cross, the Crucifix, the altar and shrine, and clerical raiment. Symbols of State often convey political ideas just as religious symbols come to convey theological ones. Associated with many of these symbols are appropriate gestures of acceptance or respect: a salute, a bowed or bared head, a bended knee.

319 U.S. at 632, 63 S.Ct. at 1182.

and in its reversal of the contempt charges, impairs the administration of justice.

Although the reversal of the tax conviction is thinly veiled in the guise of an improper definition of "false or fraudulent," it is in fact nothing more nor less than a ruling that a Vietnam War protester may not be required to be punished for a willful refusal to pay withholding taxes on account of a political belief. The real extent of the ruling is revealed by the dismissal of the indictment, rather than ordering a new trial under proper instructions, because says the majority, "A claim of '3 billion,' on the other hand, could deceive no one. It is purely symbolic, the attached letter aside."

The statute of which Lyle Snider was convicted, 26 U.S.C. § 7205, creates merely a misdemeanor, and straining to give it other than its literal meaning in this case is doing a distinct disservice to the purpose for which the statute was enacted: to enforce the requirement of payment of withholding taxes in the United States. See United States v. Bishop, 412 U.S. 346, 359, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973).

As has been noted from time to time by the courts and as a matter of general knowledge, our system of collecting revenue is largely voluntary, and a statute making the willful refusal to abide by the voluntary collection system a misdemeanor certainly is within the power of Congress. As *Bishop* notes, § 7205 is merely one of a series of statutes providing penalties suitable to the varying degrees of delinquency under the income tax laws, p. 359, of 412 U.S., 93 S.Ct. 2008. The suggestion of the majority that the taxing system of the United States is not voluntary by its taking into account in its reasoning the power of the IRS to treat Snider's claim of exemption as "constituting no information," and its suggestion that adequate civil remedies were available for the collection of the tax, flies in the face of the words of Mr. Chief Justice Warren, in Flora v. United States, 362 U.S. 145,

176, 80 S.Ct. 630, 647, 4 L.Ed.2d 623 (1960): "Our system of taxation is based upon voluntary assessment and payment, not upon distraint."

The statement in the opinion of the majority that the case was tried on the theory that "the government need only prove that Snider's claim was untrue and was relieved of any obligation to show that the statement was deceptive or that it was made with an intention to deceive," is refuted by the record, for the district judge, I contend properly, instructed the jury:

"A statement, including a statement in a claim or document, is 'false' if it was untrue when made, and was then known to be untrue by the person making it, or causing it to be made.

"A statement, or claim, or document is 'fraudulent' if it was falsely made, or caused to be made, with the intent to deceive."

The first place to go for the construction of a statute would seem to be to the statute itself. " . . . [T]he other omissions which the statute denounces in the same sentence . . . aid in ascertaining the meaning as respects the offense here charged." United States v. Murdock, 290 U.S. 389, 395, 54 S.Ct. 223, 226, 78 L.Ed. 381 (1933). 26 U.S.C. § 7205 provides, in the same sentence, following the clause concerning the supplying of false or fraudulent information: "or who willfully fails to supply information thereunder which would require an increase in the tax to be withheld."

This last quoted clause of the statute, which has been given no weight by the majority in its opinion, itself states the proper construction.

The Ninth Circuit, in United States v. Smith, 487 F.2d 329, 330 (1973), a case on facts which are indistinguishable from those here, has articulated the proper rule to apply in this case which is consistent with that part of § 7205 just quoted above:

"In a misdemeanor prosecution, however, the government need not prove

fraud, loss of revenue, or reliance by the government. The offense is made out when a person required by law to complete and file a W-4 intentionally uses the form to supply false information. [Citation omitted] "Our system of self-assessment and concurrent payment of taxes as income is earned cannot survive if every taxpayer is permitted to formulate his own rules. Misdemeanor penalties were provided by Congress with the knowledge that for certain types of forbidden behavior, even though criminal conduct is not present, a mild deterrent and the certainty of punishment are vital to the system. The defendants are free to express their political discontent in other ways. When they elected to defy the tax laws, they assumed the burden of the penalties provided by those laws."

In arriving at the same result, the Third Circuit, in United States v. Malinowski, 472 F.2d 850, 857 (1973), specifically rejected the symbolic speech argument adopted by the majority here:

"Thus posited, appellant's First Amendment argument is but a suggestion that a member of society can be absolved of the responsibility for obeying a given law of the community, state, or nation if he can prove a sincere, abiding, and good faith objection to the direct or indirect object of that law. Such a position represents a feeble effort to emasculate basic principles of civil disobedience, and, simply stated, is invalid. Here, the actor wants the best of both worlds; to disobey, yet to be absolved of punishment for disobedience."

Indeed, this circuit, in United States v. Moylan, 417 F.2d 1002, 1008 (1969), in an opinion by Judge Sobeloff, has likewise rejected the proposition that moral disapproval of a policy of the United States is legal justification for a breach of a statute:

"Among philosophers and religionists throughout the ages there has been an incessant stream of discussion as to when, if at all, civil disobedience, whether by passive refusal to obey the law or by its active breach, is morally justified. However, they have been in general agreement that while in restricted circumstances a morally motivated act contrary to law may be ethically justified, the action must be non-violent and the actor must accept the penalty for his action. In other words, it is commonly conceded that the exercise of a moral judgment based upon individual standards does not carry with it legal justification or immunity from punishment for breach of the law."

The dismissal of the charge instead of reversing for a new trial indicates beyond doubt that the majority has rejected the *Moylan* reasoning and established the precedent that political beliefs furnish sufficient legal justification not only for committing crime but also for not paying taxes. To neither of these propositions may I concur.

Although thousands of perfectly well intentioned persons doubtless believe with all sincerity that the Second Amendment's protection of the right to bear arms is violated by the Gun Law, e. g., 18 U.S.C. Appendix § 1201 et seq., such a contention would be frivolous as a factual, as contrasted to a legal, defense to a charge of its violation, and the defense here that the defendant did not have to comply with the Internal Revenue statutes is no less lacking in merit. A detailing of other examples which come to mind would add nothing to the thought, and it will suffice to say that while a jury has the right to disregard the law and discharge a defendant, a court may not. Sparf and Hansen v. United States, 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895). Is the law to say that because of a firmly held good faith belief about a political question any person is to be excused as a matter of law of a violation of statute? I think not.

The majority, then, as opposed to the jury, gives no credence to Snider's own admission on the witness stand as to what he was doing:

"Again I didn't feel, nor did my wife, that we could say that we were doing

all we could to maintain a consistent witness for peace and opposition to war if we did not file—if we continued to pay our taxes. In other words, we either had to say, 'Well, no, I'm not doing all I could,' or we had to say, ' "No, I can't pay my taxes'."

I submit the majority's reversal of the contempt convictions of the Sniders also does not rest on either sound precedent or policy.

The majority holds that a failure to stand in the courtroom after a direction by the bailiff, the marshal, and by the presiding judge may not subject the person failing to stand to contempt of court for it is "not misbehavior within the meaning of 18 U.S.C. § 401 and does not constitute criminal contempt of the court." The majority reasons "The rising requirement seems to us not essential to the functioning of the court; as such, the failure to rise does not constitute a material obstruction. If the failure to rise distracts others, provokes a reaction on their part, or even causes 'a failure to become silent or focus attention on the business before the court' . . . we think the fault may better be resolved by compelling silence and attention rather than by coercing a gesture of respect." I particularly note the majority states it does not hold that the failure of the Sniders to stand is excused on religious grounds as the defendants themselves claimed.

During the two-day trial, Snider failed to stand after being admonished by the bailiff, the marshal, or the court, any or all of them, on 16 separate occasions. His wife was similarly admonished on one occasion. The situation was quite different from that normally encountered in criminal trials. The trial attracted much local interest, and the interior of the courtroom was packed, while crowds of people milled about the courthouse, and Snider's supporters outside passed out leaflets extolling his virtues to spectators and passersby. The finding of the majority that the Sniders did not make the trial a forum for the expression of their political or religious

beliefs is contradicted in the record. The district court noted that a leaflet, entitled "Snider's War Tax Resistance Result of a Strong Faith in God," had been taken from a member of another jury panel, and that Snider's supporters had "clogged the corriders, sat down on the floors, sat around in a circle right outside the jury room and right outside the main entrances to this courtroom. . . . " Snider, his wife, and seven spectators remained seated when the court took its initial recess on the first day of trial. Snider was then counseled as to the purpose of the rule and advised that it was a disruptive, distracting factor for him to disobey the order of the bailiff and the subsequent order of the court to stand. Snider was told that he could at anytime purge himself of the contempt, but he chose not to.

In this setting, at the conclusion of the trial, the district judge heard the contempt charges against Mr. and Mrs. Snider and summarized his findings as follows:

"The transcript which will be attached hereto and made a part hereof reflects that the Court warned the defendant, Lyle B. Snider, that his actions constituted direct contempt, and initially advised the defendant that it was a disruptive, distracting factor for the defendant to disobey the order of the bailiff and the subsequent order of the Court to stand. Also, at the close of the first day of the trial, the Court admonished the defendant that each contemptuous act was a separate offense, and also that it was a continuing offense, and that the defendant could at any time purge himself of the contempt.

"The Court finds as a fact that the conduct of Lyle B. Snider heretofore set forth was disrespectful and contemptuous to the Court, and was calculated to disrupt the order and decorum of the Court. Forcing the extra burden on the Court of interrupting the trial to repeatedly admonish and warn the defendant about his disruptive and distracting behavior served to

obstruct the administration of justice while the Court was in actual session. The Court, therefore, finds that such conduct constitutes criminal contempt committed in the actual presence of the Court.

\* \* \* \* \* \*

"Attached hereto and made a part of this order will be the transcript of the pertinent parts of the proceedings, reflecting the imposition of the extra burden on the Court of explaining the traditions of the Court and personally ordering her compliance with the rules of the Court.

"The Court finds as a fact that the conduct of Sue T. Snider heretofore set forth was disrespectful and contemptuous to the Court, and was calculated to disrupt the order and decorum of the Court. By her actions, which necessitated explanation of, and personal requests by the Court for compliance with, the rules of the Court, Mrs. Snider served to obstruct the administration of justice while the Court was in actual session. The Court therefore finds that such conduct constitutes criminal contempt committed in the actual presence of the Court."

Yet, the majority has ignored these findings and has declined to say that the district court abused its discretion, but, instead, holds that discretion to punish the Sniders' conduct never did exist in the first instance, apparently because it disagrees with the findings of fact of the district judge that the behavior of the Sniders was disrupting and distracting and obstructed the administration of justice.

I am in disagreement with the majority as it holds that the custom from time beyond memory of rising upon the opening of each session of the court may not be punished by contempt, and do not

agree with the dictum that such conduct may be excused on the ground either of symbolic speech or of religious preference. Such a ruling simply adds another crack in Mr. Jefferson's wall. "Neither a state nor the federal government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State'." Everson v. Board of Education, 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947). I am of opinion the Sniders had no more business regulating affairs in the courthouse than the judge would have had regulating affairs in the meeting house.

Directing the dismissal of the contempt charge places this circuit in conflict on the merits with two others. See In re Chase, 468 F.2d 128 (7th Cir. 1972); United States v. Malone, 412 F. 2d 848 (7th Cir. 1969); and Comstock v. United States, 419 F.2d 1128 (9th Cir. 1969). The opinion is also in conflict with *Chase* as to its procedural dictum as it is with *Sacher*, supra. Each of those cases involved summary contempt proceedings under FRCrP 42 where sentencing on the contempt charge was delayed until after the immediate proceedings, just as we find it here, and I disagree with the dictum of the majority that full notice and hearing was required. The conduct of the Sniders took place in the presence of the court and jury during the actual trial, and the implied requirement of the majority that the judge must either punish the offenders on the spot, and perhaps declare a mistrial, see *Sacher*, p. 10 of 343 U.S., 72 S.Ct. 451, or forfeit his power to summarily punish for contempt, I conceive to be an impermissible hamstringing of the inherent power of any court to maintain orderly proceedings.[1] Jus-

---

1. "We hold that Rule 42 allows the trial judge, upon the occurrence in his presence of a contempt, immediately and summarily to

punish it, if, in his opinion, delay will prejudice the trial. We hold, on the other hand, that if he believes the exigencies of the trial

tice is badly served by encouraging a flagrant and deliberate disregard of the lawful order of a judge in his own courtroom. Each person, whether he be litigant, lawyer or spectator, so long as he is in a courtroom, may be required to yield the expression of so much of his beliefs as not to interfere with the administration of justice. It is not possible in this land of ordered liberty for all of the thousand beliefs to be expressed on each occasion. The expression by word or deed of the private convictions of the Sniders, although they may be deeply held, should yield, during the trial, to the imperative need of the community in having an established forum in which controversies between man and man and citizen and sovereign may be decided in a calm, detached, neutral atmosphere.

The district judge to his everlasting credit was a model of decorum, dignity, and propriety throughout what could only have been a most unsettling experience. He endured the repeated disregard of his orders with the patience of Job. I can find no reason in law, fact, or policy for reversing the judgments of contempt.

I may not, as my brothers do, cast aside countless generations of tradition and establish the rule in this circuit that the opening of court need not be accompanied by the rising of those in attendance. "Everyone rise," of course, is now removed from the lexicon of the bailiff, for no order of any court should be made unless it is to be obeyed. Such could only lead to a further degradation of the courts.

I find one small solace in the opinion. Since it is not based upon federal constitutional grounds, it need have no effect upon the various States in the Circuit.

It follows that I would affirm the convictions, both as to the tax and contempt charges.

require that he defer judgment until its completion he may do so without extinguishing his power." Sacher v. United States, 343

## ORDER

CRAVEN, Circuit Judge.

The court having been polled on the suggestion of one member for rehearing en banc and a majority of the active members voting against it, the suggestion fails. Judge Russell and Judge Field join Judge Widener in voting for rehearing en banc for the reasons stated in Judge Widener's dissenting opinion and for the reasons advanced by Judge Field in the attached separate statement.

FIELD, Circuit Judge (dissenting):

I am in wholehearted agreement with the views expressed by Judge Widener in his able and well reasoned dissenting opinion. Despite the disclaimer of the majority, it occurs to me that its approach to this case would, in effect, "reduce the withholding system 'to a shambles'." Today it is a Quaker with firm convictions about the Vietnam conflict who disregards the tax laws of the Nation to dramatize his position. Tomorrow it may be one who elects to follow such a course for any one of a variety of ideological or political beliefs. As stated by Judge Aldisert in United States v. Malinowski, 472 F.2d 850, 857 (3 Cir. 1973), which the majority is at some pains to distinguish or, in the alternative, declines to follow, Snider "wants the best of both worlds; to disobey, yet to be absolved of punishment for disobedience." Unfortunately, the majority grants him just such a Utopian choice.

With respect to the reversal of the contempt charges, I can add little to the observations of Judge Widener except to say that this is merely one more regrettable step which undercuts the authority of the already beleaguered district judges who are charged with the orderly administration of justice in the trial arena and, unlike us, do not live in the sterile and sometimes unrealistic environment of the appellate ivory tower.

I would grant rehearing and rectify this unfortunate decision.